## Calloway et al. v. Octavia J. Coal Mining Co. et al.

(Decided Dec. 7, 1937.)

G. R. BLACKBURN for appellants.

CALDWELL & GRAY for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Theodore Calloway, while working in the mine of the Octavia J. Coal Mining Company, died on February 14, 1928. Both he and the company had accepted the provisions of the Workmen's Compensation Act (Ky. Stats., sec. 4880 et seq.). Within due time his three sisters and brother applied for compensation, which was denied by the Workmen's Compensation Board. On petition for review to the Pike circuit court the action of the board was set aside and the claimants were awarded $4,000. On appeal the judgment was reversed on the ground that the board made no findings of fact and rulings of law, and the cause was remanded to the circuit court with directions to send it back to the board to make such findings. Octavia J. Coal Mining Company v. Calloway, 238 Ky. 438, 38 S. W. (2d) 250. On the return of the case to the board the claimants asked permission to take further evidence. Permission was denied and the board made findings of fact and law, and again denied compensation. On petition for review to the circuit court the cause was remanded to the board, with directions to permit the claimants to take the deposition of Will Hardwick. Thereafter Hardwick's deposition was taken and filed, and H. C. Wills and Robert Fannin testified in rebuttal. The board then made findings of fact and rulings of law, and again denied compensation. On petition for review to the Pike circuit court the award was affirmed and the case is before us for review.

The vital question in the case is, whether Calloway died of electrocution.

The third right entry of the mine was about 24 feet wide with a 44 inch haulage track extending along the middle of the entrance. The trolley wire used in the operation of motors while hauling cars through the entry is attached to the roof, about 17 or 18 inches to the right of the right-hand rail of the track as you enter the mine. On the left-hand side of the entry is room No. 10, and the entrance to the room was several feet distant from the nearest point of the trolley wire in

the entry. According to some of the witnesses there was a trolley in room No. 10. According to others there was no trolley but the motor was operated by means of a cable, which was hooked to the trolley wire by what is called the "nib." H. C. Wills, the first witness introduced by the claimants, testified in substance as follows: He was working on the night shift, and Calloway died about 3 o'clock in the morning. He was the motorman, and Calloway was braking and loading dust. They were engaged in hauling a cut of mine cars out of room No. 10. He was riding the motor and Calloway was on the bumper of the last car next to the face of the coal. When they stopped Calloway got off and came down the right side of the wire on the opposite side.

> "He was trying to get the coupling pin out and he kind of crossed over to the other side, but he wasn't very close to the wire, and I heard him making a noise, kind of like he was wanting to talk to me, and I looked around and he was kind of going down slow. He just went right down and never fell or anything."

Calloway came right down between the cars. Calloway was always complaining about something just like darkies will. It was about 10 or 15 minutes after he got to the darky before anybody else got to him. The next person who reached him was Bob Fannin. When he got to Calloway he was like someone sitting down, and he examined Calloway from his waist up to see if there was any juice or anything. He found his tongue up in his mouth. He had not swallowed it. When Calloway came through to the other side he told him to watch that wire. There was no trolley wire going up in room No. 10 that night. On being asked if Calloway was in such position that if he would stand up for any reason he would come in contact with that wire, witness said:

> "Of course, if a man straightened up he would come in contact with a wire that far away from him (indicating)."

E. C. Lewis, superintendent of the Majestic Collieries Company, and a mining engineer, testified that on certain occasions 250 volt current would kill a man, but you would have to have a pretty good contact with it. Goble K. Ball, the undertaker who embalmed Calloway's body, testified that Calloway's blood was in a liquid state. Lynn B. Hatfield, registrar of the bureau of vital statistics in the Hackney district No. 60, testi-

fied that the death certificate of Theodore Calloway, signed by Dr. W. J. Smith, the regular camp physician of the Octavia J. Coal Mining Company, was filed with him, and gave the cause of his death as electric shock. Afterwards Dr. Smith came to him and said the certificate was wrong and he would tear it up and make out one that was right. He filed another stating that the cause of death was "Not known." The last certificate was filed with the state authorities. E. M. Wagner, district mine inspector, testified that Calloway's death was reported to him. After that someone in the mine undertook to point out the place where Calloway died. It was at a point where a left-hand entry had turned from a right-hand entry off the main entry and about 15 feet from the right-hand entry. There was an unguarded trolley wire along that point. He did not recall who it was who pointed out the place to him. Mack Williams gave evidence that Calloway boarded with him, and after his body was removed from the mine it was brought to the bathhouse at his place. Calloway's neck was swollen and his face seemed to be blistered. Mary Williams, wife of Mack Williams, also gave evidence to the effect that Calloway's neck "was swelled awful bad." According to Judy Morris, the claimants were dependent on Calloway, and when he saw Calloway's body there was a burn on his neck. There was other evidence to the effect that Calloway was strong and in good health. According to Onis Fields, he and Carl Self were the first men to get to Calloway. There was a trolley wire in room No. 10. When he got there Calloway's feet were under the wire and the rest of his body was lying out from the wire. Wills said that Calloway was uncoupling the motor from the car and had a fouled pin. When he jerked on the pin the pin came out and the back of his neck hit the wire. He did not notice any scars or burns on Calloway's face. Porter Woods testified that there was a trolley wire in room No. 10. According to Clyde Johnson, there was a trolley wire on the entry, but no trolley wire in room No. 10.

For the Company we have the following evidence: Dr. W. J. Smith testified that he prepared the first certificate on information that Calloway had been killed by electricity, and finding afterwards that there was some question about it he changed the certificate to coincide with his actual knowledge of the case. His examination of Calloway was very casual. C. S. Duncan, the company's superintendent, testified that there was no trolley

wire in room No. 10 at the time of Calloway's death. Cars were hauled out of the room by a cable. The nib of the cable was attached about 12 or 15 feet from the mouth of the room. He examined Calloway. He had not swallowed his tongue, nor was there any sign of electric juice. Calloway worked for him at the Mary Martha Coal Company, and he would come out if there was any smoke and say that his heart was weak. According to the map used by Duncan in testifying the man engaged in uncoupling at the rear end of the motor could not come in contact with the entry trolley wire. Arthur Hagy, on being informed that Calloway was killed, examined his body, opened his mouth, and found that Calloway had not swallowed his tongue. When he got there the body was lying opposite the motor and the first car on the right-hand side going into the room. There was no trolley wire in the room. Robert Fannin arrived 5 or 10 minutes after Calloway was dead. Calloway was "hunkered" down between the motor and the first car. He looked at Calloway to see if there were any bruises or burns and could not find any. He looked at his tongue and it was normal. Calloway had not swallowed his tongue or frothed at the mouth. He did not believe that Calloway's body was on the rail. All the cars were behind the motor in the room. Calloway had complained to him that it hurt him to work in the smoke. He complained of his heart and of being dizzy. The evidence given by Will Hardwick is in substance as follows: He and Calloway occupied the same room at the boarding house. Calloway's death occurred in room No. 10 on the third right entry, and between 8 and 10 feet from the entry. There was a trolley running into the room. At the time of his death Calloway was pulling a fouled pin out of the coupling. The pin was twisted and he had to reach behind him to pull it out. As he reached behind him his hand slipped and he raised his head to get from between the cars. The higher portion of his neck came in contact with the live trolley wire, and he fell whining and groaning just like a sick person. Calloway's clothes were wet at the time. The accident happened about 2 o'clock. Calloway's health was good. Calloway's neck was swollen. He never saw Robert Fannin at the time of the death. He did see Hiram Wills, Onis Fields, and Carl Self. They came about 5 minutes afterwards. Hardwick's evidence was somewhat weakened on cross-examination.

In rebuttal H. C. Wills testified that he was the

only person present at the time of Calloway's death, and Mr. Fannin was the first man to come to him. His motor had stopped just in the clearance where it comes out of the mouth of No. 10. There was nothing ahead of the motor toward the entry. He and Fannin moved the body. At that time Hardwick had not gotten there, but came a few minutes after the body had been removed. He denied as stated by Hardwick that the front end of the motor was in the room first. He also denied that there were any cars between the main track and the back end of the entry, as stated by Hardwick. He also contradicted Hardwick in many other respects. In rebuttal Robert Fannin testified that when he got there the motor was sitting in the mouth of No. 10 and the front end of the motor was toward the entry. When he got there Wills had gone after a colored fellow by the name of Willie. He and Wills took hold of the body and moved it from between the cars. All the cars were in room No. 10, and none of them was headed toward the entry. He did not think there was ever any trolley wire in the room.

Counsel for appellants has filed an able brief and attacked the findings of the board on numerous grounds. It is argued that, where the only two persons claiming to have been present at the time the deceased met his death testified as to his position with reference to the trolley wire, and no one else claims to have been present, the holding of the board that the deceased was not at the place where the two witnesses said he was is a finding on undisputed facts, and therefore reviewable on appeal. Attention is also called to the evidence that Calloway was pulling at a fouled coupling pin, that he was admonished to stay off that side, that he was between the motor and the car, that his clothes were wet at the time of his death, that the company's doctor filed a death certificate showing death by electric shock, and that the company sent a telegram to the relatives of Calloway telling them that he was killed by electric shock, and it is claimed that none of this evidence is disputed. The rule that a finding of the Workmen's Compensation Board upon undisputed facts is a finding of law, and therefore reviewable by the courts, may be conceded, Bates & Rogers Construction Company v. Allen, 183 Ky. 815, 210 S. W. 467, but it hardly can be said that the evidence discloses a case of undisputed facts. It is true that Wills illustrated how a man straightening up might come in contact with the wire,

yet, when all his evidence is considered, it tends to show that Calloway died at a place several feet distant from the trolley wire. Then, too, Hardwick's evidence does not go uncontradicted. Both Wills and Fannin say he was not present. He placed the front of the motor in room No. 10, while the other witnesses testified that the motor was headed the other way. He also disagreed with other witnesses as to the location of the cars. Indeed there is a conflict of evidence on every question of fact. There was evidence that Calloway was at a place where he could not have come in contact with the trolley wires, and evidence to the contrary. Some of the witnesses say that his neck was swollen and burned. Others saw nothing the matter with his neck or other parts of the body. It is shown that the doctor's certificate was made out from information furnished by others and not from a personal examination. The same is true of the company's telegram. In the circumstances it cannot be said that only a question of law was presented, or that the board's findings of fact have no support in the evidence.

But it is argued that the rule that the findings of fact by the board are conclusive, unless there is an entire absence of evidence to support them, does not apply where there is a claim of fraud, and there is no denial of the facts constituting the fraud. The difficulty with this position is that the facts pleaded did not show fraud. The fraud referred to in the statute is "the fraud or misconduct of some person engaged in the administration of this act, and affecting the order, ruling or award."

The evidence does not show that the company's physician acted fraudulently in withdrawing the first certificate of death, and, even if he had, it would not have presented a case of fraud on the part of some person engaged in the administration of the act. The only other facts relied on to show fraud are the various rulings and findings of the two boards which were held by the court not to be a compliance with the statute. Clearly fraud means something more than mere mistakes or errors of judgment in the administration of the act, and aside from these there was nothing of consequence pleaded in the petition for review. It is proper to add that two boards, composed of entirely different members, have denied appellants compensation, and no fraud having been shown, and it appearing that

the award is supported by substantial evidence, it is necessarily conclusive.

But the further point is made that the board's finding of facts was not sufficient because it did not make a separate finding on every disputed fact, and appellant's motion for additional findings should have been sustained. In addition to finding that Calloway and the company had accepted the provisions of the Workmen's Compensation Act, that his average weekly wages were sufficient to justify the maximum compensation, and that the claimants were dependent upon him for their support, the board found that the death of Calloway, "was not caused by electric shock or other traumatic injury while engaged in the performance of his work under the employment of the defendant."

All that is required is that the board shall "state its findings of fact on all of the issues determined by it." Broughton's Adm'r v. Congelton Lumber Company, 235 Ky. 534, 31 S. W. (2d) 903. It is not necessary that it shall make a separate finding as to every fact in the chain of evidence leading up to the ultimate fact. In the recent case of Lewis v. Fordson Coal Company, 249 Ky. 258, 60 S. W. (2d) 585, a finding "that the stroke of paralysis of August 23, 1929, or any disability therefrom, was not the result of injury sustained on March 2, 1928," was held sufficient. As the controlling issue in this case was, whether Calloway died from electric shock, the board's finding "that his death was not caused by electric shock or other traumatic injury while engaged in the performance of his work under the employment of the defendant" was clearly sufficient.

Judgment affirmed.