# Wisconsin Coal Corporation v. Haddix et al.

Dec. 1, 1939.

Craft & Stanfill for appellant.

Carl Perkins and Clark Pratt for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

In the court below appellant was plaintiff; Lula Haddix (real party in interest) and members of the Compensation Board were defendants. Lula Haddix was the widow of John Haddix, who met his death on May 7, 1937, while in the employ of appellant, operator of a coal mine in Knott county.

In due time the widow filed her application with the Board seeking adjustment of her claim, it being asserted that her husband met his death as a result of an accident arising out of and in the course of his employment by appellant.

After preparation of the case, a referee of the Board who investigated and heard proof, recommended compensation for claimant at the rate of $12 per week for a period of 335 weeks. Appellant's motion for a full Board review was sustained, and upon review the Board adopted the referee's recommendation.

The employer being dissatisfied with the ruling of the Board, filed in the Circuit Court its petition for a review, which after reciting the facts above stated, and jurisdictional facts, alleged substantially that:

(1) The opinion and award of the Board is not in conformity to or with the provisions of the Compensation Act. Kentucky Statutes, Section 4880 et seq.

(2) The Board acted without power and in excess of the power conferred by the Compensation Act.

(3) There is no evidence competent or otherwise, upon which to base said opinion, or to base the Board's finding of fact, hence the award is based solely on conjecture, surmise and speculation.

The prayer was, that the circuit court review the Board's decision, and if concluding it was not supported by sufficient evidence, to set it aside, remand to the Board with directions to set the award aside and deny the claim. Appellees filed joint and separate answers, admitting allegations of facts leading up to, and the award, but denied the conclusions above recited, and asking that the petition for review be dismissed.

The court after reviewing such evidence and proceedings as had been presented to the Board, said that it had been unable to find any errors in the award of the Board, upheld it and appellant asked and was granted a review.

When we read appellant's brief, we conclude that the allegations of the petition to the effect that the award was not in conformity with the Compensation Act, and that the Board acted beyond its power, are merged in the argument in brief to the effect that the award was made upon insufficient proof of the proximate cause of the accident resulting in the death of Haddix. This argument is also applied to the conclusion reached by the trial court upon review. Appellant to support its contention relies upon two domestic cases: Hardy-Burlingham Mining Company v. Hurt, 253 Ky. 534, 69 S. W. (2d) 1030; Calloway v. Octavia Joy Coal Mining Company, 271 Ky. 8, 111 S. W. (2d) 395, and opinions of the courts of other jurisdictions.

On the hearing before the referee appellant introduced no proof. It was agreed that at the time Haddix met his death appellant was operating under the terms of the Compensation Law, and Haddix had accepted. It was also agreed that his wages were sufficient to entitle claimant to the maximum compensation allowed, if she be entitled to any compensation.

The proof shows that Haddix was between thirty-

five and forty years of age; he was over six feet tall, and his estimated weight was around 200 pounds. He had been working in mines for eleven or more years, and for a part of that time had been engaged in the same class of work which he was doing at the time of his death, operating a tram motor. According to the proof he had not lost a day from his usual work on account of any illness, and was in good spirits at the time he went to work.

At the time Haddix met his death he was working with Dan Lawson, who was doing the coupling of the tram cars which were pulled, or to be pulled by the motor which Haddix was operating. The two went to work about 5:00 P. M. They worked perhaps, three hours before Haddix was missing from his post. The two had cleaned out three or four rooms, and Haddix backed the motor into No. 2 to take out some empties. Lawson did the coupling, and told Haddix to go ahead, and he went, ''I guess about 10 or 15 feet, and the motor stopped and rolled back down against the cars. I stood there awhile and directly hollowed at him to go ahead; didn't know what was done.'' Lawson waited a short time and started back ''to see what he was doing, and when I got nearly around the car I heard him groaning.'' Other miners came up and they took him into some nearby house and laid him on a table. He says some doctor examined Haddix; he did not know who the doctor was; this doctor did not testify. Later the body was taken to a hospital. Haddix apparently was dead before the miners moved his body.

The motor is operated by electricity. The power line carries an average of 250 to 275 volts, but would not cut out before the voltage reached more than 500. The wire which directly carries the power, runs along the main entry and is fastened to the mine roof directly over the right tram track as you go into the mine. A track leads from the main entry into rooms Nos. 1 and 2, which are more than 40 feet apart, and on the left side of the main entry. The wires of the motor were insulated. The motor Haddix was operating, said to be higher than some other in use, had a cable which wound on a reel on top of the motor. When the motor leaves the main entry track to go into the various rooms, the motor cable is hooked or ''nipped'' on to the trolley wire on the main entry, and as the motor proceeds, the wire on the reel unwinds. The action is just the reverse as

the motor moves out of the room; when the main entry is reached, the nib is removed from the trolley wire by the motorman.

It is shown that at the end of the motor cable, the insulation is removed for approximately two feet toward the fastening end; apparently this is looped into the nib, which is a metal crook, being about one foot back from the cable end. The motorman holds this nib end in his left hand.

It is shown that the mine nad a low roof. At the point where he met death it is 45 inches from the right rail to the top of the mine, 38 inches from the same rail to the trolley wire, and 25 inches from the seat in the cab to the trolley wire. In operating the motor on the main track the motorman has to lie over on his left side, holding the nib with his left hand, thus throwing it over his left shoulder, while using his right for control.

In coming out of the mines the trolley wire is practically over the left hand rail; the motorman's seat on the left corner of the motor cab. Apparently this would place some portion of the uninsulated wire over the left shoulder, and back of his head. Likewise in going in and out, his head would not be a great distance from the trolley wire.

At the time of the accident two miners were drilling in room No. 1, and to get power to operate drills, had used a two-wire cable, separated near the end; one wire was hooked to the right rail of the main line track going into the mines, and the other hooked to the trolley wire above, both extending across the track, and at a point not far from where Haddix' body was later found. Lawson, who took the motor out, had the drill man remove the cable before he could proceed. He had to loosen it from both the rail and the trolley.

We gather from the evidence that the motor stopped after the empties had been pulled from room 2. It is upgrade from room No. 2 to room No. 1, and Lawson says that the rear car had nearly reached the switch on the main line when the motor stopped. He also says that when the motor stopped, the cars moved back for 10 or 12 feet, into the cars which were left in No. 2. In this situation it would appear that the motor was, when stopped, near the drill cable connected by the drillers, as described above.

From the above description of the scene, the motor and its operation and the operation of drill cables, it is perceivable that Haddix' head and neck, and one hand, were dangerously near an uninsulated wire carrying more than enough voltage to have caused his death.

Dr. Hagan made an examination at the request of "Mr. Williams, adjuster for the Bituminous," a few hours after Haddix died. He says he made a "particular autopsy," but no microscopic or sectional examination of the heart. He found an abrasion on the left side of the chin, half way between the edge of his chin, and the lip; "it was about the size of a nickel." He found nothing abnormal about the heart. Asked the question: "From the examination did you form any opinion about the cause of his death?" He answered:

"No sir, I signed the death certificate, and I have to do that, and I signed it 'heart failure.' He had to die, and I could find no other cause of death from the autopsy I did, and I didn't do it complete. I just signed it as heart failure."

The attorney led the doctor to remark that he didn't know what else to say.

Witnesses, who were present when the doctor made the examination, testify that the heart was removed, and the doctor said that it was normal. Several witnesses, besides Lawson, saw the body shortly after it was brought out of the mine. One testified that he saw what looked like a little scratched place on the side of the head, but noted no discoloration. Another noted the place on Haddix' chin, and the place on the side of his neck; the place on the chin looked like the top skin was either burned or knocked off. Another saw a mark on the right side of the neck about two inches long, which "looked like a ridge," and also saw the place on the chin.

The undertaker was not clear as to his recollection of any particular marks, but noted a slight scar on his chin, and a slight mark on the back of his neck about two or two and a half inches long, "narrow, less than a pencil mark." This witness made a report of the death by motor accident, but says it was so made on information by persons who brought the body to his establishment.

An electrician for appellant testified, going into de-

tail, though not clearly, as to the mechanism and operation of the motor, the drills and the general situation. He testified as to voltage, and from his experience and observation, what voltage would cause death. He had seen several cases of death from contact with electric current, where no marks were left on the body. This could occur if the injured person had on wet clothing, as was the case here. He also testified that the shock did not always kill instantly, "it depends on how hard he gets it. The motor was working on direct current; contact with a live wire is supposed to knock you, not supposed to hold you like a. c.; that is the difference."

Without going further into the testimony, it is not at all difficult to conclude from the whole situation, at the time Haddix met his death, that his death was caused by contact with electric current.

Counsel for appellant relies on the two cases mentioned above as being conclusive, or at least persuasive of his contention, that the Board's finding and the court's decision, were based on conjecture and surmise. This assumption by the appellant is based, partially perhaps, on a statement which we find in his brief, to the effect that Dr. Hogan stated that the cause of Haddix' death was heart failure. When we read the testimony carefully we do not agree. If his evidence is of probative value, it appears to us, as it must have to the Board, likewise the court, that Haddix did not die of an organic disease, particularly so in view of the other undisputed facts and circumstances.

We need not attempt to distinguish the two cases cited by appellant, supra, but refer the reader to them with the belief that the instant case will be easily distinguished when all the facts, which we have detailed in the instant case, are considered comparatively with the simple statement of facts in the cases cited.

We express the opinion that the case before us is one which may be properly classified with Lee Clay Products v. Stamper, 268 Ky. 786, 108 S. W. (2d) 1069; Codell Construction Company v. Neal, 258 Ky. 603, 80 S. W. (2d) 530; Big Elkhorn Coal Company v. Burke, 206 Ky. 489, 267 S. W. 142; Raymond Contracting Company v. Little, 255 Ky. 461, 74 S. W. (2d) 926; Consolidation Coal Company v. Branham, 243 Ky. 780, 49 S. W. (2d) 1035; Louisville Gas & Electric Company v. Duncan, 235 Ky. 613, 31 S. W. (2d) 915.

682

In the cases cited above it will be found that the facts, not in all but in some of them, are similar to the facts and circumstances in the instant case, and in all these cases we have laid down the general rule that although the finding of the Board be based on circumstantial evidence, yet such evidence is sufficient when the facts and circumstances detailed are so related to each other, that an inference of liability may be fairly drawn and without being based merely upon guess or surmise.

After a careful review of the proof we are unable to say that there is no substantial probative evidence to support the Board's finding, which we would be compelled to say if we overthrow the Board's award, since the rule, as will be seen by reference to the last cases above cited, is that it is only where there is a total lack of evidence to sustain the findings of the Board that this court, or the circuit court, may reverse its findings of facts.

For the reasons above stated the judgment is affirmed.