MCVICAR v. HARPER HOSPITAL.

1. WORKMEN'S COMPENSATION—ELECTROCUTION—EVIDENCE.

Evidence was sufficient to support finding that hospital maintenance man died from electrocution arising out of and in the course of his employment while attempting to repair electric motors powering so-called dummy waiters in small cubbyhole reached through trap door in ceiling of service kitchen.

2. SAME—CONFLICTING TESTIMONY—FINDING BY DEPARTMENT.

On review of a finding of fact by the department of labor and industry the Supreme Court does not weigh conflicting testimony to determine when plaintiff has met his burden of proof but merely ascertains whether there is competent evidence to sustain the finding made.

3. SAME—REVIEW BY SUPREME COURT—INFERENCES.

The Supreme Court may not weigh the testimony taken before the department of labor and industry for the purpose of deciding whether it would reach a conclusion differing from that of the department for where there is a conflict of testimony the inferences therefrom are matters for determination by the department.

Appeal from Department of Labor and Industry. Submitted October 10, 1945. (Docket No. 88, Calendar No. 43,133.) Decided December 3, 1945.

Anna McVicar, widow, and Madeline McVicar, minor dependent, of Neil McVicar, deceased, presented their claim against the Harper Hospital, employer, for compensation for his death while in its employ. Award to plaintiffs. Defendant appeals. Affirmed.

*Doelle, Starkey & Jones,* for plaintiffs.

*Lewis & Watkins,* for defendant.

Boyles, J.   Plaintiffs are the widow and minor child of one Neil McVicar, who came to his death while an employee of the defendant, the Harper Hospital. The department of labor and industry awarded dependency compensation and funeral expenses to plaintiffs, finding that Mr. McVicar died from electrocution arising out of and in the course of his employment.   For reversal the defendant claims that death was not caused by electrocution but was due to natural causes—heat prostration and cardiac failure.   The question for decision is whether there was any competent evidence to support the findings of fact by the department and reasonable inferences drawn therefrom.

Neil McVicar, 63 years old at the time of his death, had been employed by the defendant about 18 months. He seemed to be in good health, was not under any treatment by any doctor, and had made no complaint about any physical ailments.   His duties at Harper Hospital were those of a maintenance man, to help fire and pull out ashes in the furnace room, replace electric lights and fuses, maintain plumbing, fix stopped sinks, check leaks, change faucets, and answer service calls for such maintenance work.   On the day of his death, August 11, 1944, he went to work at 3 p. m. seemingly in good health.   It was a hot day. About 6 p. m. something caused some "dummy waiters," used to convey food from the main kitchen up to a service kitchen, to stop working.   The dummy waiters were powered by electric motors.   A service call was made and Mr. McVicar promptly responded. The electric fuses, motors, switch, et cetera, were in a "cubbyhole" reached through a trap door in the

ceiling of the service kitchen. He had to use a step-ladder to reach the trap door in the ceiling, about 8 feet above the floor. The trap door when open was 17½ inches wide by 34 inches long, opening into a little room or cubbyhole 6 feet 3 inches wide, 40 inches high, 5 feet 2 inches deep. Inside were two electric motors, 2-horse, 3-phase, 220 volts, which operated the dummy waiters. The cubbyhole had metal frames, steel frames to carry the motors and dummy waiters. There were fuses inside the cubbyhole, to remove which a fuse puller or pliers was used. Mr. McVicar climbed up, sat in the cubbyhole on the metal framework with his feet hanging down outside. In that position he could reach the fuses and the wire terminals inside the cubbyhole. Inside were live electric contacts carrying 220 volts within his reach when he attempted to ascertain the trouble. A student dietitian, who five minutes later found that the dummy waiters in the other end of the dining room were not working, testified she saw Mr. McVicar "sitting up there in the cubbyhole" with his legs hanging down, tried to call him, that he did not answer, that she climbed up on the ladder and hit his foot to get his attention, he made no response, help was called and they took him down, dead. Only about 10 minutes had elapsed between the time the service call was put in for Mr. McVicar and the time when he was found dead.

A post mortem was performed. There were no signs of a burn. A physician present at the post mortem testified:

"*A*. Signs pointed to heat exhaustion rather than electrocution, although electrocution cannot be entirely ruled out. It is evident that this man did not die from any ordinary natural cause, inasmuch as there was no lesion of the heart or brain, or the left part of him, rather. No lesion of the heart or brain

to account for it. In other words, that note was made because when we did this post mortem the question of electrocution was present, and the question of electrocution is not decided by the post mortem. In other words, we know that he had some heat exhaustion, but whether or not he was electrocuted, the autopsy does not reveal.

"*Q.* That is why a note was put in the hospital findings indicating electrocution?

"*A.* There was none unless there is a burn. A majority of cases we get electric current and don't get a burn. Occasionally there is an electric burn. That, of course, is a finding that is positive, and when we find it, it is of great value. But the average case of electrocution dies from the shock effect of the current. They get that tremendous shock, just like we get in the legal electrocution where people are electrocuted for murder. And in such cases it simply paralyzes the respiratory center, and the man doesn't breathe again, and he is dead. And there are no findings which would lead the pathologist to say that this case died of electrocution because I found so and so.

"*Q.* Then the findings do not rule out electrocution?

"*A.* That's right.

"*Q.* And the findings do not necessarily rule in heat exhaustion?

"*A.* The findings are characteristic rule in heat exhaustion. That is the idea that I wanted to convey here. That while I knew that this man had a certain degree of heat exhaustion, the autopsy did not reveal whether or not the electrocution contributed or had something else to do with it. In other words, the findings here of heat exhaustion were positive, but we can't say anything at all from the post mortem relative to the question of electrocution.

"*Q.* Do you get findings similar to these in electrocution cases?

"*A.* We do in some electrocution cases, especially cases that die of very low voltage. I cannot testify

from my own knowledge as to what the voltage in this case was.

"*Commissioner:* 220.

"*A.* Well, the ordinary case of 220 volts doesn't have these signs, but when people are susceptible to very low voltages, as they are sometimes, and especially if they are suffering from something else like heart failure, or heat exhaustion, or are sick, people are sometimes more susceptible to electric shocks than otherwise. And also there is an individual difference there. We know that when people die from very low voltages they are liable to have a dilated heart and congested lung. They had that experience just recently down at Whitehead & Kales where they lost three men in one week from not over 40 volts, and certainly not over 90, and these men all showed cardiac dilatation and congestion of the lung.

"*Commissioner:* It is your opinion that 220 volts is sufficient to electrocute a man?

"*A.* Yes. I had a case, your Honor, on post mortem, that died on 60 volts. If the contact is good and the current has a chance to flow, some believe a very low voltage can kill.

"*Commissioner:* Let me ask you this question: Supposing a man who is inspecting a motor sits on the steel frame while presumably examining fuses; supposing while examining those fuses he inadvertently comes into contact with a bare wire which consists of 220 volts, would that cause electrocution?

"*A.* Yes, sir."

Sufficient of the evidence has been referred to or quoted herein to plainly establish that the death of Mr. McVicar might have been caused by electrocution. There is no occasion to refer to the evidence or the arguments to the contrary. We do not weigh the evidence in these cases.

"It is argued that the testimony must show that in the opinion of the medical witness the injury '*did*' cause the ulcer and it is not sufficient that it '*might*' or '*could*' cause the present condition.

"The department may draw inferences from the facts and circumstances and if we are to determine when the plaintiff has met the burden of proof, we must try the facts. The department is the sole trier of the facts and we do not weigh the evidence." *Weenink* v. *Allen Electric & Equipment Co.,* 276 Mich. 561, 563.

"Where there is a conflict in the testimony, our review is limited to a determination as to whether there is competent evidence to sustain the finding of the department. It is not for this court to weigh the testimony for the purpose of deciding whether we would reach a conclusion differing from that of the department. *Neumeier* v. *City of Menominee,* 293 Mich. 646. Where there is a conflict of testimony, the inferences therefrom are matters for determination by the department. *Weenink* v. *Allen Electric & Equipment Co.,* 276 Mich. 561." *Harris* v. *Fry & Kain,* 306 Mich. 1, 5.

The award is affirmed, with costs.

Starr, C. J., and North, Carr, Butzel, Bushnell, Sharpe, and Reid, JJ., concurred.