76 So.2d 657 (1954)
Essie Mae JOHNSON, a widow, individually and as mother and natural guardian of Anderson Johnson, Jr., Edward Johnson, Frederick Johnson, and J.T. Johnson, minor children of Anderson Johnson, deceased, Appellants,
v.
Leonas DICKS, General Accident Fire & Life Assurance Corporation, and Florida Industrial Commission, Appellees.
Supreme Court of Florida. Division B.
December 3, 1954.
Rehearing Denied January 10, 1955.
Joseph P. Lieb, of Fowler, White, Gillen, Yancey & Humkey, Tampa, and Charles F. Chastain, of Oxford & Oxford, Lakeland, for appellants.
*658 John M. McNatt, Jacksonville, and Rodney Durrance, Tallahassee, for appellees.
DREW, Justice.
This is a workmen's compensation case. Our judgment turns on our answer to the question of whether there is competent, substantial evidence under the law to support the findings of the Deputy Commissioner who made an award to claimant widow and her children for the death of her husband.
The Deputy Commissioner found: Anderson Johnson at the time of his death was working as a fruit picker. He was last seen a few minutes before his death walking with a long aluminum ladder toward a fruit tree. The grove, the grounds, and the gloves, hands and clothing of the employee all were wet. A fellow employee heard a groaning noise and a flop and ran over to find Johnson lying on the ground beside the ladder. The ladder, if stood on the ground on end, was long enough to reach high-tension wires strung above and carrying voltage high enough to cause the death of a human being. The employee's death was caused by heart failure, and there was no evidence of any prior heart disease which could have caused death. The autopsy was inconclusive as to facts which would lead to the cause of death. From the testimony the Deputy Commissioner concluded that the death was caused by electrocution which was the result of an accident arising out of and in the course of employment of deceased.
The Full Commission reversed the award in favor of claimants. The Circuit Court affirmed the order of the Full Commission.
We have examined in detail the record in this cause. The orange grove where the deceased worked was bordered on the south by Lumsden Road in Hillsborough County. The carrier offered exhibits which are diagrams of the accident location. These depict a utility pole on the north side of Lumsden Road close to trees growing in the orange grove. The crossbar at the top of this pole carried three wires which ran east and west between the grove and the road. At various places leaves and branches of the trees grew out and around the wires. These top three wires are 25.5 feet above the ground at the pole and go closer to the ground as they proceed west until they are 22.5 feet from the ground at a point about 71 feet west of the pole. Below this top set of lines are three lines which run south from the pole across the road for the purpose of furnishing electricity to a residence. These latter lines are placed one below the other with the top line being 22.2 feet above the ground at the pole. At this same distance above the ground at the pole there is another line running east and west and below the top three lines.
A witness for the carrier testified that the top three east and west lines carried about 4800 volts of electricity; that the low east and west line was a neutral wire in which there was current at times but which was grounded at each transformer and at other points so that there is no potential between that and the earth. The middle of the lower three wires running to the south carried 220 volts and the other two 110 volts.
In pictures of the accident scene the ladder used by the deceased is shown west of the pole in a position approximate to where it is said to have been found at the time of discovery of his body. One of the fellow workmen testified that he found the deceased lying one to two steps east of the ladder and right under the wires. The record does not disclose in terms of feet how far the deceased was from the pole at the time he was found upon the ground.
Deceased was 46 years of age and weighed about 156 pounds. He had worked at the orange groves for about three seasons and was in good health. A fellow workman testified that he saw deceased two or three minutes before his death at which time he talked just like he always did. Deceased was carrying a twenty-four foot aluminum ladder heading toward trees bordering the road and close to the electric wires. That was the last time he was seen alive. The fellow workman was two or three trees, *659 or about 75 to 90 feet, away from deceased. He heard a groaning noise, went to investigate, and found deceased lying upon the ground. No signs of burns were found on or about the deceased or the ladder.
There was an autopsy attended by three physicians. The summary of the findings in this report indicated that the cause of death was inconclusive and stated, "since the possibility of electrocution was cited and this is a cause of heart failure and may show no diagnostic evidence peculiar to it, conclusion must be reached from attendant circumstances." The report also recited that deceased was found at the foot of an aluminum ladder comparatively near which was a high-tension wire and that there was no evidence of recent burns to the clothing or body of deceased.
Dr. Bush, who had attended the autopsy, and Dr. Mims, who testified with reference to the autopsy report, were witnesses for claimant. Both of them were clearly of the opinion that the autopsy failed to reveal any pathological cause of death and that so far as the autopsy revealed, the deceased did not die of natural causes.
In response to a hypothetical question, Dr. Mims expressed the opinion that deceased died of electrocution; he further stated that a peculiar condition of the blood found in deceased was consistent with electrocution.
We think the evidence detailed above is sufficient to warrant the finding that the deceased died from electrocution arising out of and in the scope of his employment. Wisconsin Coal Corporation v. Haddix, 280 Ky. 676, 134 S.W.2d 232; Dixie Darby Fuel Co. v. Franks, 311 Ky. 341, 224 S.W.2d 147; McVicar v. Harper Hospital, 313 Mich. 48, 20 N.W.2d 806; Burke v. B.F. Nelson Mfg. Co., 219 Minn. 381, 18 N.W.2d 121; Botts-Hulme & Odell v. Tate, Okl., 265 P.2d 709; Buff v. Columbia Baking Co., 215 S.C. 41, 53 S.E.2d 879; Morris v. State Compensation Commissioner, 135 W. Va. 425, 64 S.E.2d 496; Cornell Wood Products Co. v. Sicheneder, 195 Wis. 267, 218 N.W. 182.
In each of the cited cases a worker in previous good health was found dead at a place in proximity to electrical equipment under circumstances in which he could have been electrocuted while engaged in his employment. In each case no natural cause of death appeared and there were no burns upon the body of deceased. And in all of the cases, except that of Burke v. B.F. Nelson Mfg. Co., supra, there was no witness who observed deceased at the time of the event of death. In each case the cause of death was not conclusively established, but the court held that the circumstances were sufficient to warrant a finding that death was caused by electrocution arising out of and in the course of the employment.
We are aware of the grave and difficult problems arising in connection with an unwitnessed death, particularly where electrocution is a possibility of death; but, under the authority of the foregoing cases, we have no hesitation to hold in the instant case that under the law there is competent, substantial evidence in the record to support the findings and conclusions of the Deputy Commissioner which in turn support the award made for the death of this worker.
Appellees contend vigorously that there is no medical evidence to show death by electrocution and that there is medical evidence which completely negatives death by electrocution. The record in this cause does not support either contention.
In support of the first contention, appellees insist no weight can be given to the opinion of Dr. Mims because the hypothetical question propounded omitted the autopsy findings. However the record shows that in the concluding portion of this question it was stated, "assuming further, Doctor, that the testimony would show that this man had just immediately prior to this enjoyed good health and no complaint or symptoms of any kind or character, that we have just gone over the autopsy report here and the autopsy report would seem applicable to the situation, what then in your opinion would you attribute the cause of death?" This reference *660 to the autopsy report is sufficient to show it was included in the hypothetical question. The inclusion of this report also renders nugatory appellees' complaint that the question did not recite the fact that there were no burns upon the clothing or body of deceased since these facts were specifically recited in the report. Appellees attack the question further because "it omitted the voltage involved." However, the question did refer to "overhead electric power lines" and the autopsy report referred to "a high tension wire." We think these references are broad enough to indicate for the obvious purposes of the question that electric power was present in quantities sufficient to cause death and therefore lend efficacy to the question in that connection. Appellees' attacks on the question have no merit and this is true particularly since the appellees failed at the time the question was propounded to point out any specific deficiency in the question but merely objected without stating any grounds for the objection. Atlantic Coast Line Railroad Co. v. Shouse, 83 Fla. 156, 91 So. 90.
Appellees further urge that the absence of burns on the body of deceased rules out the possibility of electrocution because the voltage involved in this case is 4800 volts and the record shows that contact with 4800 volts would always produce burns on the body. Much of the testimony in the record with reference to the effects of electricity upon the human body is that the effects may vary greatly with different individuals and that much yet is to be learned upon the subject. Most of the testimony with reference to whether under varying circumstances electricity entering the body will cause burns is inconclusive. There is testimony in the record tending to support this theory in that some of the doctors testified that in their opinion direct contact with 1000 and less volts may not produce burns but contact with greater amounts will produce burns and some of the doctors testified that in their opinion contact with 4800 volts of electricity would result in the leaving of burns upon the body of the person making the contact. However, the Deputy Commissioner had the right to reject this evidentiary theory of appellees. Further, even if the Deputy Commissioner had found that contact with 4800 volts always causes burns, he still would not have been required to find that the deceased did not die of electrocution. This is true because the contention of appellees assumes that if the body of deceased encountered any electricity, it must have encountered a full 4800 volts. Yet, the record does not require the assumption that a full 4800 volts of electricity must have entered the body of deceased if any electricity was encountered by him. For example, Dr. Thomas, a witness for appellees, was questioned with respect to the situation: "If this [hypothetical] man was electrocuted by the voltage [from the high-tension wires] passing through an aluminum ladder  " to which Dr. Thomas replied "We don't know what voltage it was that went into this man." And Dr. Williams, a witness for appellees, stated that if this man put a ladder on a 4800-volt electrical wire, the usual sequence would be burns on the hand at point of entrance and a burn at the point of exit. But when questioned as to the unusual sequence, Dr. Williams said, "I don't know with regard to these high tension wires, I don't know of any instances in which the sequence of events under such conditions have varied from this." Under all the circumstances of this case, the mere fact of absence of burns on the body of deceased does not require the conclusion that the death did not result from electrocution. Instead, death not having occurred from natural causes, but there being no burns on deceased, the circumstances warrant the inference that electricity entered the body of deceased in an amount sufficient to cause death but not sufficient to cause burns.
With reference to appellees' second contention, some of the four doctors who testified for the appellees expressed the view that the death resulted from natural causes being disease of the heart. But the testimony of these doctors is far short of "negativing completely" that death was caused by electrocution. For example, Dr. Dyrenforth, a witness for appellees, *661 in response to a hypothetical question, stated that in his opinion "This man's death was more likely to have been caused by pathological conditions within his own body than it was to electric shock." Dr. Annis, a witness for appellees, who was present at the autopsy, stated that in his opinion conclusions as to the cause of death "must be reached by other than medical testimony in this case." Dr. Annis stated further that in his opinion "there is no medical evidence to conclude that this man did or did not die as a result of electrocution." Dr. Thomas, who testified for appellees, was of the opinion that death was due to "myocardial failure." He said that the absence of petechiae in the deceased's blood eliminated the possibility of electrocution because petechiael hemorrhage was always found in cases of electrocution; but in this latter connection Dr. Williams, a witness for appellees, testified that "Petechiae usually occur, but I think there are instances cited in which that occurred without petechiae."
From the medical testimony, the Deputy Commissioner had a clear basis to find that death of the claimants' decedent was not attributable to natural causes. With death from natural causes being eliminated, all the circumstances surrounding this worker's death were sufficient under the authority of the previously cited cases to warrant a finding that he met his death from electrocution which arose out of and in the course of his employment.
Had the deceased lived long enough to have made a statement that his injuries resulted from touching one of the electric wires with the metal ladder or had there been actual eyewitnesses to such event and had such facts been presented to the Commissioner who heard the evidence in this cause, there would be little, if anything, on which appellees could argue that death did not result from electrocution. It is this lack of direct evidence that presents the principal problem in this case. The problem, however, is more fanciful than real because the law has always recognized the validity of inferences as evidence when such inferences are logically and naturally drawn from admitted or known facts. Inferences which naturally flow from admitted or known facts are just as valid as evidence as statements of eyewitnesses. If this were not the rule, the cause of the death of an employee to which there were no eyewitnesses would be most difficult to prove and could well result in manifest injustices. This is particularly true in workmen's compensation cases where the claimant is not bound by the preponderance of evidence rules or the rule which requires proof to the exclusion of a reasonable doubt as in criminal cases. We have repeatedly held that, while a claimant in compensation cases may not recover on mere speculation or conjecture, if the proof furnishes a reasonable basis for an inference that death or injury resulted from an accident arising out of and in the course of his employment, that is sufficient. This rule was applied by us recently in American Air Motive Corp. v. Moore, Fla. 1952, 62 So.2d 37, and there we referred to the many cases which support this thesis. In Sanford v. A.P. Clark Motors, Inc., Fla. 1950, 45 So.2d 185, 187, we said:
"This court is committed to the doctrine that when a serious injury is conclusively shown and a logical cause for it is proven, he who seeks to defeat recovery for the injury has the burden of overcoming the established proof and showing that another cause of the injury is more logical and consonant with reason."
See also Crawford v. Benrus Market, Fla. 1949, 40 So.2d 889.
In the instant case we are impelled to the conclusion that the combination of circumstances in this case justify the inference that the death of claimants' decedent was caused by electrocution. Compare Lyng v. Rao, Fla. 1954, 72 So.2d 53, 56, which involved an injury by virtue of an alleged electric shock caused by lightning. We were dealing with the elusive force of electricity. While there was no visible injury to the claimant, we also held that "The combination of the many events occurring *662 so suddenly and the injury of the claimant following so closely can lead to no other conclusion" than that the claimant was actually injured from the lightning. Moreover, we emphasized in that case what we had said before, that under such circumstances where a logical cause was shown for the injury, it became the responsibility of the carrier or employer to overcome such proof by showing that another cause was more logical and consonant with reason. We further said there that "Even if the cause was doubtful it would be our duty under the law and the basic philosophy of Workmen's Compensation Acts to resolve such doubt in favor of the claimant."
The final judgment of the Circuit Court is reversed with directions to enter an order quashing the order of the Full Commission and reinstating the award of the Deputy Commissioner.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., concur.