126 So.2d 556 (1961)
Joseph D. ORTKIESE, Petitioner,
v.
CLARSON & EWELL ENGINEERING and Florida Industrial Commission, Respondents.
Supreme Court of Florida.
January 18, 1961.
Rehearing Denied February 21, 1961.
*557 Raymer F. Maguire, Jr., of Maguire, Voorhis & Wells, Orlando, for petitioner.
Leon H. Handley of Gurney, McDonald & Handley, Orlando, Burnis T. Coleman and Paul E. Speh, Tallahassee, for respondents.
DREW, Justice.
This cause is before the Court on petition for certiorari to review an order of the full commission entered on June 1, 1960, reversing an order of the deputy commissioner dated November 24, 1959, on the ground the findings of fact were not supported by competent substantial evidence which accorded with logic and reason and that the order did not accord with the essential requirements of the law within the meaning of United States Casualty Co. v. Maryland Casualty Co., Fla. 1951, 55 So.2d 741.
The question we have for decision is whether such reversal was justified in light of the holding of the Court in United States Casualty, supra, wherein we stated, at page 745:
"* * * We are of the opinion the `substantial evidence' rule should be invoked in all cases. Even in cases which must be resolved upon a true appraisal of testimony of medical experts, the deputy commissioner's findings of facts should be upheld unless there is no competent, substantial evidence, which accords with logic and reason, to sustain them." (Emphasis ours.)
The full commission in its order after briefly touching upon the factual background of the case[1] stated:
"* * * It is well established that claimant cannot recover compensation based upon evidence which is speculative."
*558 However, it is to the order of the deputy commissioner that we must turn as the initial step for review since the deputy commissioner has adequately set out the facts relied upon to sustain the result in the instant case. Our review here is not in the capacity of a fact-finding body, but to ascertain whether findings which have been made are properly supported by the evidence.[2]
Upon stipulation the parties agreed that the petitioner claimant sustained an industrial accident on April 30, 1957 arising out of and in the course of his employment, and that he was temporarily totally disabled from the time of the accident until on or about December 18, 1958, except for one short period in December of 1957. The parties further stipulated that, on or about December 18, 1958, claimant suffered a cerebral vascular accident.
The injury to the claimant was to his right knee which required two surgical operations and extensive physiotherapy subsequent thereto because of the failure of the surgery to correct the condition admittedly arising out of the accident.[3] The record supports the findings of fact made by the deputy regarding the medical testing technique utilized on the claimant out of which he developed a great fear. It was this testing apparatus which was used along with the regular electrical physiotherapy treatments which the operating *559 surgeon stated was necessary for an `intensive reeducation of the muscles" and to "take the electrical potential of the muscles."
The record reveals the testing device used was almost medieval in the exquisiteness with which it was able to elicit pain, blood, nervous tension and utter exhaustion. The following undisputed testimony by the claimant bears this out:
"A. * * * See the office where they give treatments is in the back. She said, `Come up to my office,' so she take me up there, and I take my clothes off and lay down on the table, and she had a large machine there with an arm come out on it, and a disc she said, with a microphone hooked to it, and a needle about that long. (indicating)
"Mr. Maguire: Now, Joe 
"The Commissioner: Tell us * * How long is that, Joe?
"The Witness: I would say two inches * * * I might be off a little on that * * * I would say two inches * * * with two wires to it. It led from this machine.
"She would take that needle and she would stick it in these leaders in my leg here. (indicating)
"Q. (By Mr. Maguire) Now when you say leaders what do you mean? A. Well the ham strings, and the muscles, and the nerves. In other words she would stand and watch and pick out a spot there where you could see a nerve. It is like you know like a pulse, you see a pulse beating, you know, and she would shove that needle right straight down through there. (indicating)
"Q. All the way down the whole length of the needle? A. Especially in the meat part of the leg right and then she would turn the machine on and it would register something on a chart she said.
"Q. Did you have any feeling of this, Joe? A. Feeling? Man, I had to grip both sides of the table to hold to it and after 
"By the Commissioner:
"Q. Did she put more than one at a time in you Joe? A. One.
"Q. One at a time? A. Uh-huh, put it in here and pulled it out. (indicating) And what hurt so doggone bad or hurt a lot worse she would put the needle in here and then she would lift the needle up. (indicating)
"She would pull it up just a little bit and then she would look over on that bloomin' thing and watch that machine, and, brother, I am telling you you had it.
"Q. (By Mr. Maguire) Joe, can you tell the Commissioner what effect did it have on you? A. Well when I got up after I got the sweat wiped off of my forehead and getting the blood wiped off of legs with the towel I would be just like that.
"Q. Now what is `just like that', Joe? This record doesn't show `just like that'. A. So nervous I couldn't hardly stand up, and I would get my crutches and get on them and get out.
"Q. How long did this test take, Joe? A. Around an hour to an hour and fifteen minutes.
"By the Commissioner:
"Q. How many times did she put the needle in you, Joe, do you have any idea, once? A. I would say 25 or 30 times each time I went in.
"Q. Each leg? A. Uh-huh.
"Q. And they put the needle in you 25 times in each leg  A. (interposing) This is right.

*560 "Q. (finishing) in other words 50 times at a sitting? A. About that. I asked her a question after she gave me the first treatment there with the needle. I questioned her close. I said, `Doc, what in the world are you doing that for?' and she said she wanted to check the strength of all the muscles, and leaders, and all, she called them some names I can't pronounce, and I says, `Why mess with this leg here when I can pick up 35 pounds with it?'
"Q. (By Mr. Maguire) Now which leg are you talking about, Joe? A. I said, `Why mess with my good leg, my left leg? Why do I have to go through all the punishment with that leg?' and she said, `I want to compare the two legs.'
"Q. Joe, did this treatment you are talking about, this poking of needles into your leg, did that make you nervous? A. Nervous? Man, you couldn't * * * I couldn't hardly lay on that table.
"Q. Joe, every time I have asked you about your nerves you have always said, `Man,' or `Oh, boy.' Well that doesn't tell me anything of what you are talking about. A. I will say, yes sir, it sure did.
"Q. After the treatment was over what did you do, the first time that she gave you this test? A. After it was over I sat there a while then I got up and went home and went straight to bed. I had to. I was so nervous that I couldn't * * * I couldn't sit up. I mean I was just plumb exhausted.
"It seemed like I didn't have one ounce of strength left."
Such an electrical treatment was given the claimant on December 16, 1958 according to the deputy and two days later claimant reported back upon directions for another treatment with a "stinger type machine" which, according to the claimant, made him jump from the table due to electrical shock.[4] On December 18, 1958, claimant having reported for further electrical shock treatment and after the physiotherapy had commenced, it was discovered the claimant had an involvement of his right arm and leg and was partially unable to speak.
Claimant's condition was diagnosed as a cerebral thrombosis by Dr. J. Cornall Howarth, a neurosurgeon called by the respondent as a witness. He stated that the condition was an obstruction to one of the blood vessels in the brain and gave a direct answer to the following question:
"Q. This cerebral thrombosis could have occurred by virtue of the physical therapy treatment he was taking and that causing him to be excited and irritable and anxious and causing high blood pressure and thereby causing the cerebral thrombosis, that would be just as likely as your finding the arteriosclerosis in this man and just as well as you finding this clotting situation that you say this man has? A. Yes that is true.
"Q. In other words, the physical therapy, we have here three alternatives, physical therapy and high blood pressure and cerebral thrombosis, is [it] could have just as easily and logically *561 occurred by that chain of events could it not Doctor? A. Yes it certainly could, that is true."
The doctor at another time testified:
"Well I would have to put it this way, that if Mr. Ortkiese was a person who was going to have a cerebral thrombosis he would be somewhat more likely to have it after going through a period of stress like this but if he was not susceptible to cerebral thrombosis he might have gone through this and a good deal more without having it."
The deputy had before him an orthopedist, a neurosurgeon, the claimant and claimant's wife. The orthopedist admitted he was not trained in vascular diseases, and therefore there was no disputed testimony whatever regarding the accident, the treatment, and the subsequent deleterious effects giving rise to the claimant's present condition. Not only was it undisputed but it was unanswered. The carrier did not overcome the proof offered by showing that another cause of the condition was more logical and consonant with reason.[5]
We have held that a trauma is an injury, wound, shock, or "the resulting condition or neurosis."[6] Here there was an unbroken chain of events that directly connect the claimant's accident with his subsequent condition of vascular debility.[7] It is argued the evidence was inferential and speculative, but the findings of the deputy lucidly and without equivocation pointed out the factual basis necessary to support his order without drawing on inference or speculation. The undisputed hierarchy of facts consist of first, the accident; next, the unsuccessful operations; thirdly, the trying siege of electrical and needle physiotherapy resulting in high blood pressure due to the traumatic excitement of the treatment giving rise, according to the respondent's doctor, to the cerebral thrombosis.
The deputy commissioner considered all the evidence of the steady progression of events which allowed for reasonable explanation.
This was supported by competent substantial evidence which showed the basis for the award.
The order of the full commission is quashed with directions to re-instate the order of the deputy commissioner.
THOMAS, C.J., TERRELL and ROBERTS, JJ., and DAYTON, Circuit Judge, concur.
TERRELL, Justice (concurring specially).
April 30, 1957, petitioner suffered an injury to his knee which the employer and carrier accepted as compensable and barring a short period in December they paid the claimant temporary total disability compensation and medical benefits regularly from date of the accident to December 18, 1958. The medical benefits included two operations on claimant's knee and care in one of the best orthopedic clinics in the country. Approximately sixteen months treatment in the orthopedic clinics did not adversely affect the claimant but this period was followed by approximately three months of treatment which was harsh and more severe. Part of it included injections with needles energized with electric current.
The claimant testified that this treatment was so severe that it caused violent involuntary physical motion and muscle spasms; that he would go home "washed out" and that he could do nothing for hours following the treatment. He became irritable and nervous following the treatments; December 16, 1958, claimant reported to the Institute for his regular treatment, when he had *562 a tingling sensation. The physiotherapist called an Institute physician who determined that the treatment should not be given so the patient was sent home. During the day the tingling sensation increased, his right leg and arm became numb and his speech became slurred. Claimant then went to Dr. Bright McConnell of the Jewett-Wright Clinic, the attending orthopedic doctor who called in consultation Dr. J. Cornall Howarth, a neurosurgeon. Dr. Howarth diagnosed claimant's condition as a cerebral vascular accident. This appears to have occurred December 18, 1958, when the employer and carrier refused to provide further medical treatment as a result of the cerebral accident.
A claim for compensation was then filed. The deputy commissioner took testimony and on November 24, 1959, entered an order finding said claim to be compensable and ordered the employer and carrier to pay compensation and medical benefits. On review by the full commission the order of the deputy commissioner was reversed and the Florida Industrial Commission by order dated June 1, 1960, denied any claim for compensation and medical benefits growing out of the cerebral accident. We are confronted with an appeal by certiorari from the order of the full commission
The first question presented is stated by petitioner as follows: In a workmen's compensation case where a serious injury is conclusively proven and a logical cause for it is shown, must the logical cause be proven by reasonable medical certainty in order for claimant to prevail?
The full commission reversed the award of the deputy commissioner because the medical testimony in support of the logical cause for the serious injury did not meet the test of reasonable, medical certainty. It seems to me that in requiring proof of the logical cause of the injury to be tested by "reasonable medical certainty" the full commission has substituted a different rule of proof from that which this court has determined to be proper in workmen's compensation cases.
In Crawford v. Benrus Market, Fla. 1949, 40 So.2d 889, this court said that where the fact of a serious injury is conclusively shown and a logical cause for it is proven, he who seeks to defeat recovery for the injury has the burden of overcoming the established proof and showing that another cause of the injury is more logical and consonant with reason. In this case the serious injury was at the outset admitted. Some of the cases hold, however, that this did not relieve claimant from making proof of cause of the injury when claim for it was made in the manner shown.
This court has frequently approved the rule laid down in Crawford v. Benrus Market, supra. In Sanford v. A.P. Clark Motors, Fla. 1950, 45 So.2d 185, 187, after pointing out that the court was committed to the doctrine in the Benrus case, we said:
"The proof of appellees (employer and carrier) falls far short of this standard. No other rule could possibly give the force and effect to Workmen's Compensation that the makers purposed for it. Even in doubtful cases the doubt should be resolved in favor of the claimant."
In Johnson v. Dicks, Fla. 1955, 76 So.2d 657, 661, this court reversed the circuit court and thereby affirmed the award of the deputy commissioner for death benefits by electrocution, among other things, saying:
"It is this lack of direct evidence that presents the principal problem in this case. The problem, however, is more fanciful than real because the law has always recognized the validity of inferences as evidence when such inferences are logically and naturally drawn from admitted or known facts. Inferences which naturally flow from admitted or known facts are just as valid as evidence as statements of eyewitnesses. If this were not the rule, *563 the cause of the death of an employee to which there were no eyewitnesses would be most difficult to prove and could well result in manifest injustices. This is particularly true in workmen's compensation cases where the claimant is not bound by the preponderance of evidence rules or the rule which requires proof to the exclusion of a reasonable doubt as in criminal cases. We have repeatedly held that, while a claimant in compensation cases may not recover on mere speculation or conjecture, if the proof furnishes a reasonable basis for an inference that death or injury resulted from an accident arising out of and in the course of his employment, that is sufficient."
In proving or showing a state of facts from which it may be reasonably inferred that claimant was engaged in his master's business when the injury took place, and a logical cause for it is proven, certainly relevant medical testimony may be used but it is not required that such testimony attain the status of "reasonable medical certainty." Such a holding excludes the weight to be given inferences as evidence pointed out in the quotation from Johnson v. Dicks, supra. Such a holding would impose an inordinate burden on many claimants in workmen's compensation cases. It would require claimants to pinpoint, with precision or certainty, the course or cause of a serious injury which the law never contemplated. Such a holding would exclude proof by inferences when extracted from proven facts.
I think the reason for this is that in workmen's compensation cases we unconsciously apply or lean too heavily on the rule of proof beyond and to the exclusion of a reasonable doubt as in criminal cases or the rule of proof by a preponderance of the evidence as in civil cases and in so doing overlook the fact that we are concerned only with the rule that where the fact of a serious injury is conclusively shown and a logical cause for it is proven, he who seeks to defeat recovery for the injury has the burden of overcoming the established proof and showing that another cause of the injury is more logical and consonant with reason. Were it not for the weight given to inferences and the fact that we are required to resolve doubts in favor of the claimant, it would at times be impossible to establish one's right in a compensation case.
In 36 Words and Phrases, p. 287 the definitions of "reasonable certainty" take a wide range, depending on whether it relates to contracts, damages, criminal law or some other aspect of the law. In Ballard v. Kansas City, 110 Mo. App. 391, 86 S.W. 479, the court said that where a physician testified that the results of plaintiff's injury "in all likelihood" were permanent, the term quoted should be treated as equivalent to reasonable certainty. In St. Louis A. & T.R. Co. v. Burns, 71 Tex. 479, 9 S.W. 467, the court said that to say that proof of the fact must be made reasonably certain is, by literal import of the words, tantamount to saying that proof must be made beyond a reasonable doubt. It is synonymous with moral certainty. In workmen's compensation we are required to show a serious injury and a logical cause for it which may be shown by inference.
Medical science, said Dr. Howarth, the claimant's physician, knows three causes for cerebral accident; one of these was eliminated, another was not tested by the doctor who treated claimant. The doctor who treated him testified that the third cause, tendency of the blood to clot, could have produced the serious injury. In view of this state of the evidence, the lack of direct evidence, the weight we give to inferences as evidence when logically drawn when considered in connection with the effect of the harsh treatment given claimant as testified to by him and pointed out herein, it is not unreasonable to infer that they had something to do with precipitating the cerebral accident. It certainly surpasses proof by mere speculation and conjecture and would require the carrier *564 to show that another cause of the injury is more logical and consonant with reason.
In this view I do not overlook the remoteness of the cerebral accident from the primary injury which the carrier admitted and is still paying medical benefits for. It is a fact, however, that during this period the claimant was under the medical care of the carrier and that the evidence of the claimant and the doctor is such that it may be reasonably inferred that it induced or contributed materially to the cerebral accident or injury complained of. This interpretation resolves any doubt in favor of the claimant which we are required to do and accords the workmen's compensation act, F.S.A. § 440.01 et seq., the beneficent purpose the legislature intended it to have. It would also approve the order of the deputy commissioner if based on an accurate appraisal of the evidence.
Medical or other relevant testimony may be offered in support of any factor in a workmen's compensation case but I do not understand that the "logical cause" or any other factor must be proven by "reasonable medical certainty." The fact of an injury and a logical cause for it cannot always be established by reasonable certainty. It must often be established by indirect testimony and inferences. Hence, a claimant is not bound by the preponderance of the evidence and proof to the exclusion of a reasonable doubt rule. From Hippocrates to the Mayos and the Oschners, the medical profession has progressed by research and experimentation, by chasing the guinea pig through the laboratory. In this manner it has progressed so rapidly to new and better methods of treatment, if it knew any such rule as reasonable medical certainty today, it would be discarded for a different one tomorrow, but in any event the ultimate question of whether compensation is due is a judicial, not a medical, one. It was never intended that the medical profession be the supreme arbiter in compensation controversies. That responsibility rests upon the judiciary.
In workmen's compensation a "serious injury" must be conclusively shown and a "logical cause" for it must be proven. That is the end of it unless respondents can show that another cause of the injury is more logical and consonant with reason. In either event, the rule for settling issues in civil and criminal cases is inapplicable.
For the above reasons, as well as those advanced in the opinion of Mr. Justice DREW, I agree that the deputy's order should be reinstated.
ROBERTS and DREW, JJ., concur.
NOTES
[1] "On April 30, 1957, claimant, a 50 year old carpenter, was injured when he was walking up some steps and suddenly turned around, cracking the bone in his right knee. The injury was accepted as compensable and paymants of compensation initiated. Claimant was required to undergo two operations to his knee, which was the right knee, and required to undergo many physiotherapy treatments for the purpose of increasing muscle tone in his leg. While the claimant was undergoing these physiotherapy treatments for his leg muscles he suffered a cerebral accident on December 18, 1958. At the time of the cerebral accident he was receiving compensation for temporary total disability. A claim was filed on May 18, 1959, stating that the employer and carrier refused to provide remedial treatment in connection with the stroke and had failed to pay certaia medical bills."
[2] Hardy v. City of Tarpon Springs, Fla. 1955, 81 So.2d 503, 507:

"It has been suggested that the instant case should be reviewed and affirmed because the evidence shows no material conflict but is susceptible only of an interpretation favorable to the decision. However, it is futile for this Court to examine the record because it is not our duty to, nor should we, sit as a fact finding body to determine from the evidence the facts in the first instance. Nor can we on review ascertain whether the evidence is sufficient to establish facts which have not been found by the Deputy Commissioner. Nor is it our duty nor are we required to inspect the evidence in order to determine opposing contentions about what it may show, or to state such findings of fact as the evidence may permit. The Deputy Commissioner is the only person having authority to make findings of fact. Our examination of the evidence is not for the purpose of making fact findings but is for the purpose of ascertaining whether findings which have been made are properly supported by the evidence."
[3] The operating surgeon testified:

"A. Well I will say again after the second procedure and he didn't regain function he was I might say somewhat anxious. He had lost his job and was concerned about that, and the fact that his leg wasn't coming along but very stable other than that, which I think would be a normal anxiety on anyone's part.
"Q. Now, Doctor, what medical advice and treatment did you give him following the physiotherapy in the months of February and March of 1958? A. Well it was recommended * * * He kept on with us at our Clinic in physiotherapy on through the summer of 1958 continuing with the whirl pool and exercising in an endeavor to regain the muscle power.
"It was not until August of 1958, this was then seven months following his second surgical procedure, that I was personally dissatisfied with the way he was getting along from the standpoint of his still not being able to lift more than two pounds of weight, and I again brought him before the group of doctors associated with myself, mainly Dr. Jewett, Dr. Stanford, Dr. Wright, and Dr. Brady on the 28th of August for a second presentation.
"It was at this time that we infiltrated a local anesthetic into the knee joint to see whether or not the abolition of pain would increase his motor power, but it didn't appreciably affect it.
* * * * *
"A. * * * this man had practically no quadriceps power that he had an approximately partial disability of 75 per cent of the lower extremity.
"Q. And as relates the entire leg?
A. That is correct.
"Q. I judge that this was one of those unfortunate type cases that just everything seemed to go wrong though? A. It certainly was. It has been a very dissatisfying case professionally to work with a man this long and then have something like this turn up.
* * * * *
"Q. And what instructions did you give him in connection with wearing this brace? I mean is he supposed to wear it all the time, or just part of the time, or what? A. Yes, he is supposed to wear it whenever he is walking that is correct."
[4] "The Commissioner: He said the first time he jumped from the table. He testified to that once before.

"Mr. McDonald: I had never understood he jumped from the table from anything than the needles now. What is correct on that now? I want to clarify something about when you testified sometime this morning about some treatment made you jump from the table. Now what was that?
"The Witness: That was when used that stinger. In other words would stick the end of it in a pan of water to start with and wet it, and then they would take that and turn the juice on and then put it on the leaders and muscles in your leg, and, brother, when that hit you I mean you come away from there. * * *"
[5] Lyng v. Rao, Fla. 1954, 72 So.2d 53, 56.
[6] Ibid.
[7] Andrews v. C.B.S. Division, etc., Fla. 1960, 118 So.2d 206; David M. Woolin & Son, Inc. v. McKain, Fla.App. 1959, 110 So.2d 92.