DREW, Justice.
Petitioner seeks review of an order of the full commission of the Florida Industrial Commission reversing an award of the deputy commissioner granting certain benefits to the petitioner.
The laical facts are undisputed. Petitioner was injured by an accident arising out of and in the course of his employment with his employer, Lowry Electric Company, in Key West, Florida on June 10, 1957 when, while employed as a journeyman electrician, he sustained injury to his back while attempting to climb a scaffold. He was furnished medical care and attention by the company doctor for this injury.
Petitioner then went to work for the Whitmore Electric Company in Key West, Florida and on June 18th, eight days after the above accident, petitioner sustained another accident, arising out of and in the course of his employment as a journeyman electrician with the Whitmore Electric Company. This accident happened when the claimant was bent over attempting to secure a drink of water from the spigot of a barrel placed on a concrete block. As claimant was bent over, a piece of concrete block, weighing 15 to 20 pounds, fell from a height of 35 to 40 feet, which is the height where blocklayers were laying blocks, and landed on the claimant in the middle part of his upper back just below the shoulder blades. This blow caused claimant to be “pretty well knocked out”.
While claimant was treated by the same company doctor who had treated him for the accident of June 10, 1957 and who found as a result of the second accident there were no broken bones, claimant suffered with the following (according to his undisputed testimony) symptoms continuously from the date of the second accident, i. e. June 18, 1957: “sore back”, “bad headaches”, insomnia, dizziness, nausea and vomiting. These symptoms are extremely important, first because they are uncontroverted and, second, because they must be considered in light of the type of treatment rendered the claimant and the opinions of the medical experts testifying at the hearings.
In the chronological course of events, this claimant, who was allowed to return to work by the original attending physician under the conditions testified to above, was working for Whitmore Electric Company on October 28, 1957 when he collapsed on the job experiencing a severe muscle spasm in the lower lumbo sacral area of his spine. Claimant’s employer paid for treatment by a naturopath and claimant was discharged as cured after being off work for about two weeks.
Claimant, still suffering from headaches, nausea, dizziness, and vomiting, returned *571 “to work for the Whitmore Electric Company, took aspirin and was given home therapy by his wife to keep going on the job. In spite of this, however, on May 6, 1959, about two years after the accidents •of June, 1957, claimant collapsed at home and had to be removed to the hospital in Key West. Claimant was again treated in the hospital by the original company doctor for twenty-seven days and, in a semi-paralyzed state from the hips down, was placed in traction and, while he was subjected to numerous tests, he was not then, nor had he theretofore been given a spinal tap. Claimant’s condition upon release from the hospital still remained undiagnosed and claimant requested the ■company doctor to give him the name of some doctor in Miami who could cure him.
The company doctor gave petitioner the name of a doctor in Miami, said latter doctor suggesting to claimant more x-rays be secured but rendering no treatment. Not having received any relief from any medical source, the claimant saw the operating physician who finally took a spinal tap and myelogram (both diagnostic procedures) and determined claimant was suffering from bilateral perineural cysts which, when decompressed operatively, brought relief to the claimant who, over a period of over two years previous to the operation subsequent to the accidents of 1957, had sought medical relief from bis suffering and finally found a doctor who discovered the cause of the suffering.
Because the employers both contended that claimant was not suffering from any disability causally related to the industrial accidents of 1957, that he was not in need ■of any remedial treatment and that his claim was barred by the statute of limitations, claimant initiated these proceedings.
The deputy commissioner found that claimant’s disability was due to his employment with both employers, and that the appearance of the perineural cysts was •causally connected with the two accidents. He awarded the claimant temporary total compensation benefits and ordered the same to be paid in equal shares by both employers. He reserved jurisdiction to determine the amount of attorney’s fees at such time as claimant has reached maximum medical recovery and disability, if any. He also reserved jurisdiction to determine the reasonableness of certain medical expenses.
The voluminous record in this case sets forth the depositions, statements and direct evidence of the several physicians and surgeons who testified in this case. As is usually the case, these opinions are in serious conflict. It is quite obvious, however, that the original treating physicians, including one who did not testify, not only failed to correctly diagnose the claimant’s illness but were not qualified so to do. One of the treating physicians, a naturo-path, stated that only a neurosurgeon could make a diagnosis of sacral nerve root cyst or perineural cyst. Another treating physician assumed that the claimant was suffering from a condition later revealed to be completely erroneous and was actually treating him for a considerable length of time therefor.
The question of weighing the conflicting opinions of medical experts has been considered by this Court on numerous occasions. In Andrews v. C. B. S. Division, 118 So.2d 206 (Fla.1960), we carefully and in detail laid down the rules by which such testimony should be weighed and evaluated and therein pointed out that it was the duty and responsibility of the deputy commissioner to reconcile such testimony if possible but where, as here, and as in so many cases, such testimony is irreconcilable, we said it lay within his province to accept the opinion of the expert or experts he determined to be com-portable with logic and reason, taking into consideration all of the other pertinent evidence he had before him. In that case we pointed out that, if he accepted the testimony of some and rejected that of others, it was necessary for him to explain why he did so in order to afford *572 the reviewing body a competent record for reaching the conclusion whether he departed from the essential requirements of the law in so doing.
In this case we are impressed with the thorough and conscientious analysis of the detailed and well prepared findings of the deputy commissioner.[1] He was *573 careful to explain why he accepted the testimony of the operating neurosurgeon, stating among other things that the conclusion of such neurosurgeon with reference to the causal connection between the accidents of June 10 and June 18 and the perineural cysts was supported not only by the uncontradicted history of the claimant’s injuries and subsequent symptoms and evidence over a long period of time but also by the testimony of the expert produced by the carrier and admitted by the parties to be the world’s leading authority upon this particular subject. Our examination of his findings with respect to this matter leads us to the conclusion that the findings of the deputy are not only supported by competent substantial evidence but are certainly the only logical and reasonable conclusion that could have been reached.[2]
*575 The law does not require a claimant in a workmen’s compensation case to prove his claim by a preponderance of the evidence.[3] Insofar as causal relationship between an accident and a subsequent condition is concerned, this Court has long since laid down the rule that the medical evidence should establish such facts with reasonable medical certainty. In the case of Ortkiese v. Clarson & Ewell Engineering, 126 So.2d 556, 561 (Fla.1961), in disposing of a factual situation quite analogous to that presented here, we said:
“ * * * Here there was an unbroken chain of events that directly connect the claimant’s accident with his subsequent condition of vascular debility. It is argued the evidence was inferential and speculative, but the findings of the deputy lucidly and without equivocation pointed out the factual basis necessary to support his order without drawing on inference or speculation. The undisputed hierarchy of facts consist of first, the accident; next, the unsuccessful operations; thirdly, the trying siege of electrical and needle physiotherapy resulting in high blood pressure due to the traumatic excitement of the treatment giving rise, according to the respondent’s doctor, to the cerebral thrombosis.
“The deputy commissioner considered all the evidence of the steady progression of events which allowed for reasonable explanation.”
This is simply another case where the full commission has stepped beyond the limits of its authority and pitted its findings on the evidence against that of the deputy. This it may not do.
The order of the full commission is quashed with directions to affirm the order of the deputy commissioner and to send the case back to him for the purpose of determining the unresolved questions of the reasonableness of the bill of Dr. Strain and the amount of attorneys’ fees.[4]
It is so ordered.
THOMAS, Acting C. J., and THOR-NAL, O’CONNELL and HOBSON (ret.), JJ., concur.

. This review revolves around the pivotal point of whether the findings of the deputy on the question of the conflicting evidence of the experts are sustained by competent substantial evidence. This being so, his specific findings on this point are set forth below:
“Turning first then to the question of causal relationship to either or both of the hereinabove described accidents. While the medical authorities relied on by the respective parties have not expressed complete unanimity of opinion as to whether the perineural sacral cysts from which the claimant suffers were or are causally related to the traumatic episodes sustained by the claimant it is highly significant to this Deputy to note that not one medical expert, including Dr. Isadore Max Tarlov, recognized by all counsel as one of the most eminent authorities in the world today has stated that the claimant’s condition is not related to trauma.
“Further, while Dr. Tarlov’s hypothetical opinions were procured through the actions of one of the carrier’s attorneys his depositions taken in New York City on two different occasions wore deemed of sufficient value to the claimant’s cause that both were offered and received into evidence as a claimant’s exhibit. The first deposition was offered solely as an exhibit against Whitmore Electric Company, the second deposition as an exhibit against both carriers.
“Summarizing Dr. Tarlov’s first expressed opinions, on page 15, when asked if he had an opinion as to the causal relationship if any of the June 18th accident, Dr. Tarlov’s answer was:
“ ‘It is that that accident might have aggravated a condition but did not precipitate it or it was not the inaugurating circumstance’
and thereafter on page 17, when asked if he had an opinion as to the causal relationship if any of the June 10th accident, his opinion was:
“ ‘That that accident might well have produced certain changes that led to the development of the full blown perineural cyst.’
“In Dr. Tarlov’s second deposition taken in New York City on May 13, 1980, and after having been asked why, based on the hypothetical questions presented to him, he did not feel that the June 18th trauma of the falling block was the cause of the claimant’s condition, his answer was that he did not feel the June 18th accident was the cause of the claimant’s complaints because he had not had included in his hypothetical question the fact that the claimant had suffered from or manifested certain symptomatology which would be indicative of hemorrhaging within the spinal cord, specifically headaches, nausea, dizziness and vomiting. This is highly significant in light of the testimony of the claimant and the proffered testimony of the claimant’s wife that within approximately 10 days after his accident of June ISth, he had begun to suffer from all of those symptoms taking copious quantities of aspirins and receiving home therapy from his wife in the form of heat treatments to his lumbo sacral spine. Dr. Tarlov did state, however, that he felt that by reason of the trauma of June 18th that the claimant had experienced some hemorrhaging within the spinal cord and that he, Dr. Tarlov, does subscribe to the medical theory that hemorrhage within the cord will tend to migrate either upwards or downwards between the membranes of the spinal cord known as the arachnoid and the pia and that the hemorrhagic material might thereafter lodge and produce perineural cysts in the lumbo sacral area of the spine.
“Dr. Tarlov further testified that at least half of the perineural cysts demon-stated by him had an antecedent history of trauma and that such trauma could either be direct to the area where the cysts appeared or could be occasioned by indirect or transmitted stress or trauma.
“Also received into evidence without objection of carriers counsel was the deposition of Dr. Richard E. Strain, the claimant’s treating physician. Summarizing Dr. Strain’s testimony we find on page 44 thereof (by Mr. Jabara) :
“Q. Doctor, I want to ask your opinion on something and I want you to base your opinion on the fact that you now know the patient had an accident on June 10, 1957, wherein he twisted his back. Is it your opinion within a reasonable degree of medical certainty that the perineural cyst which you found in September of 1959 was caused by the accident described by the patient on June *573 18, 1957, when a concrete block struck Mm between the shoulder blades?
“A. I think that is the most likely cause in this man’s case.
“Q. Is that your opinion within a reasonable degree of medical certainty?
“A. Yes.
“Q. Is it your opinion he has not reached maximum medical improvement at this time?
“A. No. I don’t think he has. His back is still pretty stiff.
“Parenthetically while Dr. Strain did not testify in person at the hearing, he did appear and counsel stipulated that his testimony would still be to the effect that the claimant had not reached his maximum medical recovery.
“The other doctors appearing and testifying at the hearing were Dr. Basil Yates and Dr. K. S. Tolmaeh, neurosurgeons. Dr. Ehlert’s narrative medical report based on hypotheticals, as well as Dr. Tolmaeh’s opinion based on hypothet-icals were also received. In substance, Dr. Yates was unable to express an opinion as to the etiology of perineural cysts stating that they had been postulated to be of two possible origins, one traumatic, the other congenital, although he was familiar with the medical propositions of hemorrhagic blood within the subarach-noid space localizing or migrating to the low sacral area, causing an arachnoiditis of the nerve root and thereby forming a cyst.
“Dr. Tarlov on the other hand who first discovered or demonstrated peri-neural cysts on autopsy in 1931 was of the opinion that these cysts are not of congenital origin.
“Dr. Ehlert was unable to express any opinion as to causal relationship in stating, ‘I am not sure that any authority knows the exact mechanism of the produ-cation of these cysts, however, I feel it is doubtful that an injury to the thoracic area of the spine would produce sacral nerve root cysts’. While this expressed opinion would appear to reject the migration theory expressed by Drs. Tarlov, Strain, Yates and Tolmaeh, it would by implication seem to imply that he felt that direct trauma to the area where the cysts appeared would be less doubtful.
“Dr. Tolmaeh expressed views somewhat similar to Dr. Yates, although clearly stating that he had only demonstrated one perineural cyst in his entire practice, and when pressed by the Deputy for an opinion if he had to choose between one of the two accidents related to him expressed an opinion that he would be inclined to view the June 18th accident as the most probable cause.
“There not being a single opinion in the record based on reasonable medical probabilities that the claimant’s present physical condition is not causally related and to the contrary there being the definite opinion of Dr. Strain to the effect that the claimant’s condition is causally related to the June 18th accident as well as the strong inferences raised in the guarded opinions of Dr. Tarlov, preponderating towards a causal relationship to either of the aforesaid accidents and' this Deputy having considered all of the aforesaid medical opinions, he accepts as the most consonant with logic and reason the opinions of Dr. Strain and Dr. Tarlov rejecting only that portion of Dr. Strain’s testimony which attaches no significance to the claimant’s twisting accident of June 10th and accordingly makes the further finding:
“13. That the claimant’s present physical condition, to-wit, bilateral perineural sacral cysts, was and is a direct and proximate result in equal degree of the claimant’s industrial accidents of June 10, 1957 and June 18, 1957, * * * ”

. The following excerpts from the testimony of the operating neurosurgeon and of the New York expert above referred to (together with the history of evidence related in the preceding part of the opin *574 ion) are particularly germane to the question of whether there was substantial competent evidence to support the deputy’s findings:
“Q Doctor, I want to ask your opinion on something, and I want you to base your opinion on the fact that you now know the patient had an accident on June 10, 1957, wherein he twisted his back. Is it your opinion that in this instant case, within a reasonable degree of medical certainty, that the perineural cyst condition which you found in September of 1959 was caused by the accident described by the patient on June 18, 1957, when a concrete block struck him between the shoulder blades?
“A I think that is the most likely cause, in this man’s case.
“Q Is that your opinion, within a reasonable degree of medical certainty?
“A Yes.”

“Q This hemorrhaging, which eventually produces this cyst formation, tends to migrate?
“A Well, it is distributed through the whole spinal fluid; but by the force of gravity, since blood is heavier than spinal fluid, if you stand up it will gravitate down; if you lie down, it will stay in the middle of the spinal cord.
“Q If this is migrating for approximately a two-year period, are there any symptoms you would expect to find present in the individual ?
“A I don’t think he had the blood during that length of time. I think the blood got down in the dural sheath, and then the arachnoid began to proliferate out there, presumably due to irritation from the blood.
“Q Is that a common result, for blood to enlarge in this sheath and then to have this proliferation?
“A Well, I suppose it depends on whether there is space for it to get into. I would think, if you have a space for it to get in there, it can occur very commonly; but I don’t think you get arachnoid cysts forming real commonly. At least, it has not been our experience to see them frequently. They are not rare, but they are not common.
“Q If you see them forming approximately two years after a trauma * * *
“A Oh, I think formation of them probably starts soon after the trauma; but you don’t frequently find them there.
“Q How about the symptoms? How long would you expect a person to be symptom-free?
“A Well, as I say, I think that until the cyst gets large enough to produce pressure on the nerve * * * It would depend on how big the cyst was, and it would depend * * *
“Q In this case, Doctor, would you be able to answer a question as to how big the cyst was?
“A Well, if you ask, specifically.
“Q I am asking.
“A Whether this man * * * I don’t know what you are asking.
“Q When do you think the cyst was formed in this man?
“A Oh, all I can say is we didn’t even know he had a cyst until we did the myelogram on him; but when you look back and use hindsight, I think he probably was having trouble in October.
“Q In October of 1957?
“A In October of 1957, I believe it was, when he said that his legs gave way on him.
“Q. Then he was in the incipient stages of cyst formation in October; is that correct?
“Probably, yes.”
The Now York expert (said by the parties to be the world’s leading authority on this subject), who was neither a treating nor examining physician, but was called upon to answer a hypothetical question stated:
“Q We do know, doctor, that — isn’t it true that hemorrhaging — say sub-arachnoid hemorrhage — can migrate, can it not?
“A Yes, that is true.
“Q And based on your experience in th* field, would it be likely or probable that a subarachnoid hemorrhage could— that was initiated in the upper part- of the back — could migrate to the lumbo-sacral area?
“A Oh, yes. It could very well but one would have certain manifestations clinically that would—
“Q Such as what, doctor?
“A Such as very severe headache and vomiting and very severe pains that would incapacitate a man and make it very hazardous for a man to return to work three or four days after the incident.” (Emphasis supplied)

“Q ‘Trauma, direct or indirect, or any one of the manifold causes of tissue hemorrhage, may provoke bleeding and residual perineural cyst formation.’ Is that still your opinion today, doctor?
“A Yes.”
*****
*575 “Q Now, you were also given the fact that this man had had a back-twisting episode on June the 10th, eight days prior, before the concrete fell on his upper back on June 18th, were you not?
“A Xes.
“Q Can you tell us with a reasonable degree of medical probability whether or not that would have been a causative factor in the ultimate condition of peri-neural cyst which was later diagnosed and operated on?
“A I have an opinion on that.
“Q What is that opinion?
“A That that accident might well have produced certain changes that led to the development of the full-blown perineural cyst.”

. Johnson v. Dicks, 76 So.2d 657, 661 (Fla. 1954) wherein we held:
“ * * * It is this lack of direct evidence that presents the principal problem in this ease. The problem, however, is more fanciful than real because the law has always recognized the validity of inferences as evidence when such inferences are logically and naturally drawn from admitted or known facts. Inferences which naturally flow from admitted or known facts are just as valid as evidence as statements of eyewitnesses. If this were not the rule, the cause of the death of an employee to which there were no eyewitnesses would be most difficult to prove and could well result in manifest injustices. This is particularly true in workmen’s compensation cases where the claimant is not bound by the preponderance of evidence rules or the rule which requires proof to the exclusion of a reasonable doubt as in criminal cases. We have repeatedly held that, while a claimant in compensation cases may not recover on mere speculation or conjecture, if the proof furnishes a reasonable basis for an inference that death or injury resulted from an accident arising out of and.in the course of his employment, that is sufficient.”

. The reservation of the jurisdiction on the part of the deputy was not for the *576 purpose of relitigating a matured issue, t)ut was a postponement for future decision of a matter which had not boon •determined as a part of this order. We 'have upheld such procedure in Tampa Aluminum Products Co. v. Watts, 132 So.2d 414 (Fla.1901), wherein interim attorney’s fees were allowed with later •determination to be given by the deputy to other benefits and subsequent additional fees. In Boden v. City of Hialeah, 132 So.2d 160 (Fla.1961), the deputy reserved jurisdiction to later determine the question of permanent partial disability and this court held that such reservation placed the insurance carriers on notice of continuance of the employee’s claim and that the original order did not dispose of each and every claim on behalf of the claimant.