609 So.2d 748 (1992)
Rebecca L. BRADLEY, Appellant,
v.
KRAFT FOODS, INC. and Crawford & Company, Appellees.
No. 91-3214.
District Court of Appeal of Florida, First District.
December 7, 1992.
*749 Susan W. Fox of MacFarlane, Ferguson, Tampa, and Dean Burnetti of H. Guy Smith, P.A., Lakeland, for appellant.
Donald S. Bennett of Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, for appellees.
WIGGINTON, Judge.
Rebecca Bradley brings this appeal from the Judge of Compensation Claims' order denying her claim for medical treatment involving the insertion of a deep brain stimulator to alleviate her intractable incapacitating pain. For the following reasons, we reverse.
Claimant is a 44-year-old woman who suffers extreme headaches and debilitating pain in her face, neck and arm, as a result of suffering a severe blow to her face and head in an industrial accident, for which she twice underwent surgery. Since that time, she has continued to experience such pain as to render her bedridden at least two to three days per week, or longer. The pain has also caused her to lose her balance and become light-headed. She is unable to perform ordinary household duties and testified she feels she does not have much in the way of a future.
Claimant has been treated with all modes of conservative therapy including bio-feed-back, traction, physical therapy, peripheral nerve stimulation, pain medications, and nerve blocks, all without achieving significant relief. She is presently diagnosed as suffering from reflex sympathetic dystrophy  a complex pain syndrome.
In early 1990, claimant came under the care of Dr. Pyles, a board certified anesthesiologist and director of the Ocala Pain Clinic. Dr. Pyles is a diplomat of the American Board of Pain Management and specializes in the multi-disciplinary treatment of chronic pain. Dr. Pyles' treatment of claimant included the performance of two stellate ganglion blocks with no significant improvement; a cervical epidural corticosteroid injection without significant relief; a repeat of the stellate ganglion blocks again with no improvement; and, ultimately, following admission to a hospital, a continuous cervical epidural infusion conducted for over a period of three days.
At this point, when there was no impressive improvement observed, Dr. Pyles felt he was "running out of options" and that the situation called for "something extraordinary." He consulted with a local neurosurgeon, Dr. Jacob, and based on that consultation performed an interthecal morphine injection, involving the placement of a small amount of morphine in the spinal fluid. Claimant experienced impressive and remarkable pain relief for a period of approximately 22 hours following the procedure. This technique was used as a test to determine if claimant would qualify for a morphine pump installed subcutaneously with a catheter, allowing the gradual infusion of the spinal fluid with small amounts of morphine over a long period of time. This procedure is typically utilized to treat patients suffering from cancer and has been in use only for approximately five years. Since the long term effects of the treatment are not known, Dr. Pyles was reluctant to place this type of mechanism in a patient as young as claimant who did not suffer from a cancerous condition.
Dr. Jacob, in consultation, particularly discouraged installation of the pump thereby prompting Dr. Pyles to look for other forms of treatment. Dr. Pyles specifically testified that after discussion, he and Dr. Jacob concluded that claimant would be an ideal candidate for a procedure known as deep brain stimulation. It was therefore *750 decided to send claimant to Dr. William Friedman at the University of Florida. Dr. Pyles in fact testified to his desperation in finding something to help claimant, whose complaints of pain in his opinion were "very credible." When questioned whether claimant had reached maximum medical improvement, Dr. Pyles responded that she will not reach MMI until she has undergone the deep brain stimulation.
Dr. Friedman performed an evaluation of claimant at Shands Teaching Hospital in Gainesville. Dr. Friedman is a full professor and associate chairman of the Department of Neurological Surgery at the University of Florida. He is board certified in neurology and is, by the employer/carrier's own terminology, the "world renowned expert" concerning the procedure of deep brain stimulation. After the evaluation, Dr. Friedman directed a report to Dr. Jacob stating that he believed claimant to be a reasonable candidate for the procedure and that he had recommended to her that she undergo it.
Deep brain stimulation is neither new nor experimental, having been in use for 20 years and performed on as many as 1,000 patients worldwide. The results have been widely published in neurosurgical literature and the procedure has been accepted as "having a proven track record." Dr. Friedman testified he has performed 30 procedures, and that of those 30, 50 percent of his patients had been completely successful in experiencing relief of pain, enabling them to return to normal life and gainful employment. Of the remaining 50 percent, only one system required removal due to infection. Indeed, it was Dr. Friedman's feeling that the procedure would offer claimant a 50 percent chance of complete pain relief to the point where she herself could return to normal activity, including a return to work, without the need for medication or limitations.
Dr. Friedman described deep brain stimulation as follows:
[A]n electrode is inserted stereotactically into the part of the brain that controls sensation in the opposite side of the body. That part of the brain is called the thalamus. By stimulating that part of the brain, you can produce a pleasant tingling sensation in the painful body part, and the patient can turn the stimulation on and off as they need to control the pain.
He explained that the electrode is activated by a magnetically controlled computer chip implanted beneath the patient's collar bone. The entire procedure involves a hospital stay of approximately one week, and the recovery period to MMI is approximately 30 days. Following the procedure, the system requires no maintenance other than battery replacement every five years. Dr. Friedman admitted that there exists a risk of infection, or of brain hemorrhage during the procedure; however, he also testified that if the procedure is unsuccessful, "the patient is no worse than they were in general after the procedure." Dr. Friedman also expressed his feeling that the morphine pump initially considered by Dr. Pyles was not a viable alternative since it was rarely successful for pain above the waist.
Dr. Jacob concurred in Dr. Friedman's opinion that the morphine pump was a less attractive option than the brain stimulator because of claimant's age and life expectancy, plus the risk of long term addiction. Dr. Jacob's ultimate recommendation was that claimant undergo the deep brain stimulation procedure.
Dr. Pyles testified the treatment was reasonable and necessary and that the longer the reflex sympathetic dystrophy syndrome goes on without treatment, the more difficult it is to treat.
Ultimately, Dr. Friedman stated that deep brain stimulation, while "certainly reasonable," was "not necessary," but "an option."
Claimant testified that she had an understanding of the deep brain stimulation procedure and that she desired to try it, since there was nothing else that would offer her any relief. In that regard, she testified that her incapacitating pain has "destroyed [her] whole life," and that she has to take the risk: "It's all I have left."
*751 Despite the foregoing testimony and evidence, the JCC found that the procedure was not in claimant's best interest due to the risk inherent in the procedure, and because it was not medically necessary. He based that latter finding upon Dr. Friedman's opinion that it was reasonable but not "necessary," the fact that the success rate is 50 percent, and in light of the possibility of complications. The JCC therefore denied the claim for said treatment.
In so holding, the JCC not only misinterpreted the deposition testimony but misapplied the law. Clearly, the medical testimony was unanimous, unrefuted, and overwhelmingly in support of the deep brain stimulation procedure in claimant's case. Although Dr. Friedman did state that it was "not medically necessary," unquestionably he was speaking in terms of life and death, and was not applying the legal standard contained in section 440.13(2)(a), Florida Statutes (1991), authorizing necessary medical treatment as the nature of the injury and the process of recovery would require. Certainly, Dr. Friedman's testimony as a whole unequivocally supports the notion that the procedure is medically necessary in claimant's case as being the only remaining means by which claimant might achieve relief from her pain. As argued by claimant, medical testimony cannot be utilized as a game of semantics, and there are no "magic words" required to meet the applicable legal standard where the undisputed medical testimony and, indeed all the evidence, reveals that the treatment sought is both reasonable and necessary. Cf. Wal-Mart Stores v. Tomlinson, 588 So.2d 276 (Fla. 1st DCA 1991); Rodriguez v. Howard Industries, 588 So.2d 646 (Fla. 1st DCA 1991).
In the instant case, since the procedure was unanimously recommended by three medical experts possessing the highest qualifications, and no opposing testimony or evidence was presented, the JCC erred in denying the claim for this medical treatment. Accordingly, we reverse the order and remand the cause for the entry of an order directing that the employer/carrier provide the deep brain stimulation treatment as recommended.
ERVIN and ZEHMER, JJ., concur.