747 So.2d 966 (1999)
Barbara HUNT, Appellant,
v.
EXXON CO. USA and GAB Robins Business Services, Appellees.
No. 98-1420.
District Court of Appeal of Florida, First District.
September 22, 1999.
Rehearing Denied January 5, 2000.
*968 Herbert Hill, Orlando; Bill McCabe, Longwood, for appellant.
Jeffrey A. Cramer, Jacksonville, for appellees.
JOANOS, J.
Barbara Hunt, appellant, appeals an order of the judge of compensation claims (JCC) denying compensability of her claim for workers' compensation benefits. Appellant seeks review of four issues: (1) the JCC's failure to find the employer, Exxon Company, and the servicing agent, GAB Robins Business Services, appellees, waived the right to deny compensability of her claim; (2) the JCC's finding that there was no causal relationship between appellant's work activities and her diagnosis of cubital tunnel syndrome; (3) the JCC's finding that appellant's psychiatric claim is not compensable; and (4) the JCC's denial and dismissal of appellant's petitions for benefits with prejudice. We reverse as to issue one, and reverse and remand issue three for further consideration. Due to our reversal of the first issue, we do not rule upon issues two and four.
Appellant was employed as a cashier at Exxon's Walt Disney World gas station and convenience store. In her initial petition for workers' compensation benefits, dated January 10, 1997, appellant sought authorization for treatment and payment of medical expenses predicated on a repetitive trauma injury to her right elbow. The petition designated April 1, 1996, as the date of accident.
The evidence presented at the October 17, 1997, hearing established that the employer, Exxon Company, initially paid for treatment of appellant's condition. After the 120-day "pay and investigate" period elapsed,[1] appellees denied the claim, asserting *969 the physicians who treated appellant's physical injury testified they could not state with certainty that repetitive trauma at work caused her condition. Appellant's counsel argued that appellees waived the right to deny compensability, because they failed to investigate the matter within the 120-day limitation period set forth in section 440.20(4), Florida Statutes (1995). The JCC ruled that appellees established material facts relevant to the issue of compensability that they could not have discovered through reasonable investigation within the 120-day period, thus the denial of the claim was not untimely. We cannot agree.
The record reflects that appellant's employment with Exxon began in October 1994; she had been working at the Exxon Walt Disney World gas station/convenience store approximately eighteen months when she filed a claim for benefits predicated on a theory of repetitive trauma injury. In December 1995 or January 1996, appellant advised the manager of the convenience store that she had made an appointment with her personal physician, because her right arm and hand were causing her pain. After seeing her doctor, appellant advised the manager that her doctor attributed her condition to her work duties. At some point, the manager communicated this information to Exxon regional managers, after which he advised appellant the regional managers did not feel the injury was work-related and indicated she should contact her own health insurer. According to appellant, her health insurer refused payment on the ground that the injury was work-related. Since Exxon refused to take any action, appellant contacted the workers' compensation carrier.
Appellant's testimony reflects that the carrier's claims adjuster made an appointment for appellant with Dr. Adam Fenichel, an orthopedic surgeon. Dr. Fenichel treated appellant as a workers' compensation patient, and was paid by the workers' compensation carrier. The doctor diagnosed appellant's condition as cubital tunnel syndrome. The carrier authorized Dr. Fenichel to perform surgery on appellant's arm, and also authorized postoperative physical therapy. Appellant indicated that Dr. Fenichel said her injury was caused by repetitive motion and heavy lifting.
The claims adjuster assigned to appellant's case testified that Exxon initially accepted the claim as compensable, and filed a 120-day letter, pursuant to section 440.20(4), advising appellant that after investigation of the claim, the carrier would notify her within 120 days whether compensability of the claim would be accepted or denied. During direct examination, the claims adjuster testified in part:
There was nothing initially from Dr. Fenichel that indicated that he felt there was any question about causal relationship, so we went ahead and agreed to provide treatment. Basically, the surgery was authorized because we precerted it and Dr. Fenichel (inaudible) did not indicate there was any problem at that point, either. It wasn't until later on, after further questioning, when defense got involved, that there were some questions and we denied treatment, at that point.
Q. And was that because Dr. Fenichel had changed his mind or gave different testimony about causation?
A. Yes, that's when he was indicating ...[2]
*970 The following testimony was elicited during cross examination of the claims adjuster:
Q. Was it around the time that he gave his deposition, that you decided it wasn't real ... that there wasn't compensability, or when?
A. No, we ... after discussing this with defense, I think it was around February 25th, or something, that we had gone ahead and filed a denial.
Q. February 25, 1997?
A. Correct.
Q. Was there a conversation held with Dr. Fenichel, around that time frame, to your knowledge?
A. Not with me.
Q. Did you understand that he had... spoken to defense counsel?
A. Yes, I was under the assumption of that.
Q. And that's when Dr. Gutman was also deauthorized.
A. Yes.
The JCC conducted further inquiries designed to determine the nature and the date of information received by the carrier's claims adjuster which caused the adjuster to consider appellant's claim to be compensable. When the claims adjuster failed to respond to the questions posed by the JCC, appellant's counsel restated the question, asking whether Dr. Fenichel led the claims adjuster to believe that he found a causal relationship, and if so, when did that occur. The claims adjuster responded:
Initially, when we authorized the treatment, all these reports in ... appeared to indicate that the diagnosis was related to her employment.
The JCC asked:
Q. Specifically, what are you saying, "appeared to indicate"?
A. Well, there wasn't anything in his reports that said, "I don't ...
Q. "This is not"?
A. ... I don't think it's not."
Q. So, is it your testimony that he didn't say anything, or you were under the assumption, or, when you say, "he changed his mind", you're saying at one point, his mind was that it was causally related. Do you have something ... are you saying that, that he, in fact, conveyed to you, that Mrs. Hunt's injury was related to her job?
A. He never came out and specifically said that. (Emphasis supplied).
During further questioning, the claims adjuster testified that Dr. Fenichel continued to treat the injured employee, and he submitted the proposed surgery to the division for utilization review. The claims adjuster viewed this conduct as an indicator that the injury was related to appellant's employment. When the judge asked whether the claims adjuster had something she could show that would establish the surgery was pre-certified, the adjuster responded there was nothing "specifically written down where he said, ... `This is causally related.'" The claims adjuster further indicated the carrier relied upon the precertification form prepared by the utilization review nurse, which is sent to the provider to indicate the proposed procedure is medically necessary.[3]
Dr. Fenichel testified that he first saw appellant on May 8, 1996. At that time, she told the doctor she had developed pain in her right hand approximately six months before which she believed was precipitated by her work activities. Dr. Fenichel's tentative diagnosis of ulnar nerve neuropathy was confirmed by a nerve conduction study and EMG. He treated appellant conservatively with an elbow pad and a splint for tenderness at the base of her thumb. When her symptoms persisted, Dr. Fenichel *971 recommended surgery, which he subsequently performed on June 28, 1996.
With regard to a causal relationship between appellant's employment and the ulnar nerve neuropathy, Dr. Fenichel responded to defense counsel's questions in the following manner:
Q. Based upon the history that she gave you and the examinations that you have done, the diagnostic studies that you have done and your professional experience, do you have an opinion within reasonable medical probability as to whether those events, operating a cash register and doing the other duties, were the major contributing cause of her physical symptoms?
A. I did not have an opinion in that I am not certain that those are the cause of her symptoms. There is no way to know whether those activities precipitated an ulnar neuropathy, though it is frequently assumed in workman's compensation cases that those type of activities can precipitate a neuropathy.
. . . .
Q. Can you state within reasonable [degree of] medical [certainty] here today under oath that those activities were the major contributing cause of her symptoms....
A. I am not sure that I can state that, that I would be medically certain or medically, reasonably medically certain that caused her symptoms.
Q. Do I understand that the answer is no?
A. The answer is no.
During cross examination, Dr. Fenichel said that as of December 31, 1996, it was his opinion, within a reasonable degree of medical certainty, that claimant's work activity was restricted, in that she should not use her right arm for heavy lifting, grasping, pushing, or pulling. He further testified that the restrictions were causally related to the treatment he provided, and the treatment was causally related to the industrial accident, which opinion he held within a reasonable degree of medical certainty. When asked at what point in time he came to the conclusion that the industrial accident was not the major contributing cause of appellant's symptoms, Dr. Fenichel stated:
A. I did not come to a conclusion that it was not. I came to the conclusion that I am not certain. This is often the case with these type of problems where causation is not clear.
If a person falls and breaks a bone, it is clear that the fall produced the fracture. If the person develops symptoms in the course of employment, it is not always clear that the employment was the cause of those symptoms.
I see ulnar neuropathy frequently in a variety of patients, all of whom do very different things during their jobs and during their time away from work. So it is difficult for me to find that there is any specific activity that causes ulnar nerve neuropathy....
Dr. Fenichel further testified that he had a telephone conversation with appellees' counsel a few days before he was deposed. During that telephone conversation, he discussed the concept of major contributing cause with appellees' counsel. The doctor also indicated that on May 8, 1996, when he formed the impression that appellant was suffering from ulnar nerve neuropathy, he did not tell either appellant or the claims adjuster that he could not be certain that her activities on the job were causing the problem. Dr. Fenichel also testified that he never expressed uncertainty about causal relationship to the claims adjuster, and the claims adjuster never asked that question, i.e., the claims adjuster did not ask whether, in Dr. Fenichel's opinion, appellant's medical condition was causally related to her employment. The doctor first spoke of his uncertainty during his conversation with appellees' counsel. When asked whether, throughout the period of his treatment, he ever told the adjuster he could not say the *972 condition was related to on-the-job activities, Dr. Fenichel stated:
I never told them that I was certain that it wasn't or was related because I am not certain whether it is or isn't related.
According to Dr. Fenichel, it is reasonable to state that claimant's work-related activities were a probable cause of her condition. He further opined that the work-related activities are more likely than not the cause of the ulnar neuropathy.
In December 1996, after her surgery for ulnar neuropathy, appellant was treated by Dr. Michael Gutman, psychiatrist, for anxiety attacks. Dr. Gutman diagnosed appellant's condition as adjustment disorder with depressed and anxious mood. He concluded appellant was in need of treatment, and recommended treatment with antidepressant anti-anxiety medicines, and medication to assist sleep. Dr. Gutman testified:
It was my opinion the work-related injury repetitive strain, the pain, decreased range of motion, surgical interventions had an affect [sic] on her psychological makeup and mood. There was a causal relationship between her depressive symptoms and the accident.
Dr. Gutman further stated that within a reasonable degree of medical certainty, the industrial accident and subsequent treatment was the major contributing cause of appellant's condition when he treated her.
The first issue presented by appellant is the JCC's finding that appellees did not waive the right to deny compensability pursuant to section 440.20(4), Florida Statutes. Section 440.20(4) "precludes a carrier from claiming that no injury for which benefits may be due was occasioned by an accident that arose out of the employment and occurred during the course and scope of employment, when the carrier has availed itself of the `pay and investigate' provisions of section 440.20(4) and does not deny compensability within 120 days of providing requested benefits." See North River Insurance Company v. Wuelling, 683 So.2d 1090, 1091-1092 (Fla. 1st DCA 1996). Resolution of this issue turns upon Dr. Fenichel's deposition testimony.
When a single medical expert testifies concerning a particular medical question such as causation, and that expert's opinion appears vague or conflicting, it is incumbent upon the judge of compensation claims to consider all of the testimony so as to distill the essence of the expert's opinion. See Sabre Marine v. Feliciano, 461 So.2d 985, 987 (Fla. 1st DCA 1984). If the court is persuaded that the evidence will not support the judge's factual determination regarding proof of causal relationship between employment and the injury for which workers' compensation benefits are sought, the judge's factual finding will be reversed. See id.
In the instant case, appellees acknowledge that after serving the "pay and investigate" notice, the denial of compensability occurred after expiration of the 120-day investigation period provided under section 440.20(4). Further, there appears to be no dispute with regard to the material facts concerning appellees' investigation of the claim. Those facts establish the carrier did not ask Dr. Fenichel whether appellant's injury was caused by her job duties. Moreover, the pre-certification form which the review nurse purportedly used was not placed in evidence, and the pre-certification review nurse did not testify either at the hearing or by deposition.
After an examination of the entire record, we conclude that appellees failed to meet their burden to establish by competent substantial evidence material facts relevant to the issue of compensability that could not have been discovered through reasonable investigation within the 120day period. It is undisputed that Dr. Fenichel was never asked whether appellant's work activities were the major contributing cause of her ulnar neuropathy. That basic question was not asked until appellees' *973 counsel interviewed Dr. Fenichel prior to the merits hearing. Because there is an absence of competent substantial evidence to support a finding that the carrier conducted a reasonable, good faith investigation within the 120-day period permitted under section 440.20(4), appellees waived the right to deny compensability of appellant's injury.
The standard for a determination of causal relationship between employment and injury is set forth in section 440.09(1), Florida Statutes (1995), which provides:
(1) The employer shall pay compensation or furnish benefits required by this chapter if the employee suffers an accidental injury or death arising out of work performed in the course and the scope of employment. The injury, its occupational cause, and any resulting manifestations or disability shall be established to a reasonable degree of medical certainty and by objective medical findings. Mental or nervous injuries occurring as a manifestation of an injury compensable under this section shall be demonstrated by clear and convincing evidence.
A causal relationship between employment and an employee's subsequent condition or injury must be established with reasonable certainty and by objective medical findings. See Reed v. Whitmore Electric Co., 141 So.2d 569, 575 (Fla.1962). See also Claims Management, Inc. v. Drewno, 727 So.2d 395, 399 (Fla. 1st DCA 1999) (claimant is required to prove the industrial injury and its cause "within a reasonable degree of medical certainty and with objective findings").
The relationship factor is defined in section 440.02(32), Florida Statutes (1995), which states:
(32) "Arising out of" pertains to occupational causation. An accidental injury or death arises out of employment if work performed in the course and scope of employment is the major contributing cause of the injury or death.
The statutory definition of "arising out of" requires proof of two elements: (1) the claimant must have been performing work in the course and scope of employment at the time of the accident or injury; and (2) there must be proof that the employment constituted more than a contributing, competent, precipitating or accelerating cause of the accident or injury. See Claims Management, Inc. v. Drewno, 727 So.2d at 398.
The applicable legal standard may be established without pronouncement of the magic words, provided the totality of the evidence demonstrates a causal relationship between the claimant's injury and employment with the appropriate quantum of proof. See Bradley v. Kraft Foods, Inc., 609 So.2d 748, 751 (Fla. 1st DCA 1992). See also Claims Management, Inc. v. Drewno, 727 So.2d at 399. In this regard, expert medical testimony that an injured worker's employment is "more likely than not" the cause of injury conveys the same meaning as the term "major contributing cause." Therefore, Dr. Fenichel's testimony that claimant's work-related activities are more likely than not the cause of her ulnar neuropathy could support a finding that the employment constituted the major contributing cause of claimant's injury, within the meaning of Claims Management v. Drewno.[4]
The third issue concerns the JCC's denial of appellant's claim for psychiatric evaluation and care. Pursuant to the 1994 revisions to the Workers' Compensation Act, a claimant must present clear and convincing evidence that mental or nervous injuries occurred as a manifestation of a compensable injury. See § 440.09(1), Fla.Stat. (1995); McKesson Drug Co. v. Williams, 706 So.2d 352, 353 *974 (Fla. 1st DCA 1998). See also Claims Management, Inc. v. Drewno, 727 So.2d at 397. The clear and convincing standard is to be determined on the totality of the evidence, "since nothing in section 440.09(1) requires the clear-and-convincing standard to be met by medical evidence alone." See id. at 399-400.
In this case, Dr. Michael Gutman, the authorized treating psychiatrist, testified unequivocally that claimant's depression was causally related to the residual effects of her injury and the authorized surgery. The JCC denied appellant's request for psychiatric evaluation and treatment, finding the claim for psychiatric care to be dependent upon the compensability of the underlying physical condition. Since the JCC had ruled appellant's underlying physical condition is not compensable, he further found the psychiatric claim is not compensable. In view of our reversal of issue one, we reverse the JCC's denial of psychiatric care and remand for reconsideration of this matter.
In summary, after a careful review of the record in this case, we conclude that appellees failed to establish their inability to discover material facts relevant to the issue of compensability that could not have been discovered through reasonable investigation within the 120-day period provided for such investigation. In our view, a reasonable investigation would include a direct inquiry of the authorized treating physician as to whether, in his opinion, the employee's injury was related to the employment. Since it is undisputed that appellees failed to ask this critical question at any point during the 120-day period provided by section 440.20(4), we conclude the right to deny compensability was waived. Our reversal of the first issue requires reversal of the JCC's denial of appellant's claim for psychiatric care.
Accordingly, we reverse with regard to the first and third issues, and remand this cause for reconsideration of appellant's claim for psychiatric care.
KAHN, J., concurs. ALLEN, J., concurring in result with written opinion.
I agree that the appellee waived the right to deny compensability. I also agree that, in light of this waiver, the claim for psychiatric evaluation and care must be revisited by the judge of compensation claims. I specifically do not join in the majority's unnecessary discussion of "major contributing cause."
NOTES
[1] Pursuant to section 440.20(4), Florida Statutes (1995), if a carrier is uncertain of its obligation to provide workers' compensation benefits, it may initiate payment without admitting liability. The provision requires the carrier to commence an immediate good faith investigation of the employee's entitlement to benefits "and shall admit or deny compensability within 120 days after the initial provision of compensation or benefits." Subsection (4) further states:

Upon commencement of payment, the carrier shall provide written notice to the employee that it has elected to pay all or part of the claim pending further investigation, and that it will advise the employee of claim acceptance or denial within 120 days. A carrier that fails to deny compensability within 120 days after the initial provision of benefits or payment of compensation waives the right to deny compensability, unless the carrier can establish material facts relevant to the issue of compensability that it could not have discovered through reasonable investigation within the 120-day period.
[2] Appellees' counsel terminated his examination with the claims adjuster's incomplete statement.
[3] Although the precertification form was referred to numerous times during the testimony, it was not offered into evidence.
[4] Indeed, we deem it unlikely that a physician would, or should, testify unequivocally that a particular activity caused a particular injury, in the absence of some defining test, such as where an employee suffers a broken bone while engaged in a work-related activity.